# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

Karenza Clincy, Jammie Parker,
Kiesha Pough, Kimberly Jordan,
Naturee Wells, Monica Leaphart,
and Summer Sales, Individually
and on behalf of others similarly
situated,

        Plaintiffs,

v.

Galardi South Enterprises, Inc.
d/b/a/ The Onyx, Galardi South
Enterprises Consulting, Inc.
d/b/a/ The Onyx, Pony Tail, Inc.
d/b/a/ The Onyx, Michael Kapp
and Jack Galardi.

        Defendants.

**PLAINTIFFS'
MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION
FOR PARTIAL SUMMARY
JUDGMENT**

Court File No. 09-CV-2082 (RWS)

# INTRODUCTION

By illegally classifying entertainers[1] as independent contractors Defendants have managed to keep cash off the books and avoid paying payroll taxes, while still ensuring that Onyx's entertainers are a steady source of club revenue. Defendants have done this charging entertainers exorbitant fees and fines in order to work, wielding complete control over all meaningful aspects of entertainers' work at Onyx, and failing to pay the entertainers any wages whatsoever in violation of the Fair Labor Standards Act ("FLSA"). It is time for Defendants' years of illegal gains at entertainers' expense to come to an end. The entertainers at Onyx may have agreed to strip off their clothes, but they have not agreed to be stripped of their rights.

Accordingly, Plaintiffs, on behalf of themselves and similarly situated current and former entertainers at Onyx, now bring this Motion for Partial Summary Judgment on the question of whether entertainers at Onyx are independent contractors or employees. It is abundantly clear that entertainers at Onyx work for Onyx, not for themselves. The entertainers at Onyx are subject to numerous rules and requirements Onyx imposes on them. The idea that these

---

[1] "Entertainers" is the preferred term for Plaintiffs' job title—in this memo it is used synonymously with other terms commonly used to describe this work, such as "exotic dancer," "adult entertainer," and "stripper."

entertainers are somehow in business for themselves is belied by both the facts of this case and relevant case law on employee status under the FLSA, which includes numerous court decisions that entertainers are, as a matter of law, employees. For these reasons, as discussed in detail below, the Court should grant Plaintiffs' Motion for Partial Summary Judgment.

## RELEVANT BACKGROUND

Discovery in this case was bifurcated, with the first phase of discovery to address the question of whether the entertainers at Onyx are independent contractors or employees. (Dkt. 59.) Defendants have agreed that if entertainers are found to be employees under the FLSA, then Defendant Pony Tail, Inc. is their employer. (Facts at ¶ 11.) The parties dispute whether the other Named Defendants would be employers, with Plaintiffs contending that all Named Defendants are the entertainers' employers. (Prakash Aff. at ¶ 3.) Detailed facts regarding the relationship and organization of the five Named Defendants are listed in the Facts. (Facts at ¶¶ 11-23, 181-182.) However, to be clear, the question for now is whether, regardless of which Defendants bear ultimate liability, the entertainers at Onyx are employees. (See Dkt. 59.) The answer is undoubtedly yes.

# **ARGUMENT**

## I.   **LEGAL STANDARD FOR SUMMARY JUDGMENT.**

Summary judgment should be granted where, as here, the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Although "the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party[,]... the court is bound only to draw those inferences which are reasonable." Lakeside Vista Apartments, L.P. v. Federal Nat. Mortg. Ass'n, No. 1:09-CV-3136-RWS, 2010 WL 2640602, at *7 (N.D.Ga. June 29, 2010) (citation omitted).  "Where the record **taken as a whole** could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Id. (internal quotation omitted) (emphasis added).  The burden then shifts to the non-movant, "who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist." Russell v. Promove, LLC, No. 1:06-CV-00659-RWS, 2009 WL 1285885, at *1-2 (N.D.Ga. May 5, 2009) (citing cases).  Notably, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." Lakeside Vista, 2010 WL 2640602 at *7 (internal quotation omitted).

## II.   LEGAL STANDARD FOR DETERMINING EMPLOYEE STATUS.

Courts determine whether an employer/employee relationship exists by examining the "economic realities" of the relationship between the putative employee and the putative employer. Perdomo v. Ask 4 Realty & Management, Inc., No. 08-10097, 2008 WL 4682616 at *1 (11th Cir. Oct. 23, 2008); Fruend v. Hi-Tech Satellite, Inc., No. 05-13091, 2006 WL 1490154 at *1 (11th Cir. May 31, 2006). The ultimate question is whether the putative employee was, as a matter of economic reality, in business for herself or dependent on the putative employer. Fruend, 2006 WL 1490154 at *1. Notably, the determination of whether an individual is an employee or an independent contractor is a legal question perfectly suited for summary judgment, rather than a question for a jury. See Quinteros v. Sparkle Cleaning, Inc., No. AW-07-0628, 2010 WL 3000865, at *2 (D.Md. June 26, 2010) (citing cases).

The Eleventh Circuit has identified six primary factors to guide an inquiry into the economic realities of a putative employment relationship: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the extent to which the alleged employee's opportunity for profit or loss depends on her managerial skill; (3) the alleged employee's investment in the equipment or materials required for her task, or her employment

4

of other workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. Id.; accord Duncan v. Brockway Standard, Inc., No. 1:09-CV-2867-GET, 1992 WL 510256 at *4 (N.D.Ga. Sept. 21, 1992); see also Charles v. Burton, 169 F.3d 1322, 1329 (11th Cir. 1999) and Antenor v. D&S Farms, 88 F.3d 925 (11th Cir. 1996) (examining closely related issue of joint employer status to determine economic realities). Notably, "[n]o one factor is determinative, and each factor should be given weight according to how much light it sheds on the nature of the economic dependence of the putative employee on the employer." Perdomo, 2008 WL 4682616 at *1.

Looking at the economic reality of the relationship between entertainers and strip clubs, numerous courts around the country have found entertainers to be employees under the FLSA. As stated by one court within this Circuit:

> Arrangements factually similar to the one in this case have been tested by federal courts in Texas, Indiana and Colorado. See Reich v. Circle C. Investments, Inc., 998 F.2d 324 (5th Cir.1993) (whether dancer was "employee" under FLSA); Reich v. ABC/York-Estes Corp., 1997 WL 264379 (N.D. Ill. 1997) (whether dance fees were "tips" under FLSA); Reich v. Priba Corp., 890 F. Supp. 586 (N.D. Tex. 1995) (whether dancer was "employee" under FLSA); Reich v. ABC/York-Estes Corp., 157 F.R.D. 668 (N.D. Ill. 1994) (whether dance fees were "tips" under FLSA), rev'd on other grounds,64 F.3d 316 (7th Cir.1995); Martin

v. Priba Corp., 1992 WL 486911 (N.D. Tex.) (whether dancer was "employee" under FLSA); Martin v. Circle C Investments, Inc., 1991 WL 338239 (W.D. Tex.); Donovan v. Tavern Talent & Placements, Inc., 1986 WL 32746 (D. Colo.) (whether "tips" could be used to offset completely the minimum wage requirement). **Without exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.**

Harrell v. Diamond A Entertainment, Inc., 992 F. Supp. 1343, 1347-48 (M.D. Fla. 1997) (emphasis added); see also Morse v. Mer Corp., No. 1:08-cv-1389-WLT-JMS, 2010 WL 2346334 (S.D. Ind. June 4, 2010) (holding entertainers to be employees under the FLSA); Jeffcoat v. Alaska Dep't of Labor, 732 P.2d 1073 (Alaska 1987) (finding entertainers to be employees under state labor laws based on the FLSA); Chaves v. King Arthur's Lounge, Inc., No. 07-2505 (Mass. Superior Ct. July 30, 2009) (finding misclassification of entertainers under state law that examined, in relevant part, control over workers); see also Doe v. Cin-Lan, Inc., No. 08-cv-12719, 2008 WL 4960170 at *19 (E.D. Mich. Nov. 20, 2008) (granting plaintiff entertainer's motion for a preliminary injunction, holding that the entertainer was "substantial[ly]" likely to succeed on her claim that she is an employee under the FLSA.).[2]  Applying the Eleventh Circuit's economic realities test, this Court should find the same.

---

[2] The Chaves decision, which is not available through electronic databases, is attached as Exhibit 1 to the affidavit of Anna P. Prakash.

## III. THE ECONOMIC REALITIES PRESENT IN THIS CASE SHOW THAT ENTERTAINERS ARE EMPLOYEES AND NOT INDEPENDENT CONTRACTORS.

### A. THE NATURE AND DEGREE OF DEFENDANTS' CONTROL AS TO THE MANNER IN WHICH ENTERTAINERS ARE TO PERFORM THEIR WORK INDICATE THAT ENTERTAINERS ARE EMPLOYEES.

The touchstone of the inquiry into this factor is whether the putative employer had such control over the "meaningful parts" of business as to render the putative employee economically dependent.   Harrell, 992 F.Supp. at 1350.   Here, Defendants' control over entertainers' work starts from the moment an entertainer is hired, carries through nearly every aspect of work until employment is terminated, and dictates the most meaningful aspects of an entertainers' work, such as how entertainers should look, exactly when and how entertainers will remove their clothing, when and how they will dance, and how much they will charge for their services.   The details of Onyx's control over entertainers show that the entertainers work for Onyx, not for themselves.

### 1. Written Rules of Conduct.

When an entertainer is hired to work at Onyx, she is typically immediately made to read and sign her assent to Onyx's written rules of conduct[3] and is told the

---

[3] Some of the written rules include: (1) Entertainers will be subject to fines or "other appropriate discipline" for failing to call the house mom or manager to inform them of absences; (2) "All entertainers should arrive on time on the floor in costume or be subject to a late fee"; (3) "Entertainer are responsible to report to

club's general expectations regarding monetary requirements and other matters.

(Facts at ¶¶ 117-122.)   The presence of such written rules or guidelines weighs in

favor of employee status.   See Harrell, 992 F. Supp. at 1350; Morse, 2010 WL

2346334 at *3; Martin v. Priba, 1992 WL 486911 at *4.[4]

### 2. Scheduling, Fees, and Fines.

Entertainers are then required to schedule themselves, a week in advance, for

shifts that have been unilaterally set by Defendants.[5]   (Facts at ¶¶ 47-49.)   Failure

---

their stages at the beginning of the first song of their set...."; (4) "NUDE MEANS
NUDE; NO HALF NUDE ETC.; TOPS AND BOTTOMS OFF COMPLETELY";
(5) Do not "[d]rink, smoke or chew gum while on stage"; (6) "All entertainers are
responsible to dance each and every song on each of their stage sets...."; (7)
"Words on costumes are Management's Call"; (8) "Butt covers or wraps –
optional, Management's Call"; and (9) "The DJ has control of music... NOT you."
(Facts at ¶ 117 (citing and attaching deposition exhibit).)
[4] Moreover, failure to follow these and other rules simply results in fines or other
discipline. (See e.g., infra note 6; Facts at ¶¶ 66-69, 78, 84-85, 87, 91, 96, 111,
119, 130, 133-134, 138-141.)
[5] Defendants will likely make great hay over their allowing entertainers to schedule
shifts for themselves. This simple allowance does not make one an independent
contractor. See Morse, 2010 WL 2346332 at *3. In fact, that entertainers may
have had certain limited freedoms in their work, any such liberties were few and
far between and almost certainly came at a price. (See e.g., Facts at ¶¶ 50, 57-60,
73, 97 (as to higher house fees for wanting to only work a certain day a week or
arriving later in the night and fines for failing to work required days or dance on
stage).) As one court noted, "An employer cannot saddle a worker with the status
of independent contractor, thereby relieving itself of its duties under the F.L.S.A.,
by granting him some legal powers where the economic reality is that the worker is
not and never has been independently in the business which the employer would
have him operate." Martin v. Priba, 1992 WL 486911 at *3 (internal citations and
quotations omitted) (holding entertainers to be employees under the FLSA).

to set one's schedule can result in management completing a "notice of corrective action" for the entertainer.[6] (Id. at ¶ 51.) Defendants require entertainers to work a minimum of four days[7] per week and two slow days[8] per month and subject entertainers to fines for failing to meet these requirements or come to work on scheduled nights. (Id. at ¶¶ 50-52, 56-59.)[9] Such scheduling requirements support a finding of employee status. Reich v. Circle C, 998 F.2d at 327; see also Jeffcoat, 732 P.2d at 1076 ("Additionally, and significantly, the Club controlled the working hours of the dancers."). Indeed, if entertainers truly were independent contractors, they would be able to work when they wanted without any reprisal or any consequence other than losing pay for the job they were contracted to work. This is simply not the case at Onyx.[10]

---

[6] Corrective action forms are pre-printed and stored by Defendants and used to "keep a log of what [entertainers[ are not doing." (Facts at ¶¶ 128-129.)

[7] Defendants may "allow" entertainers to work fewer days if in school. (Facts at ¶ 52.)

[8] Slow days are non-busy days of the week. (Facts at note 8.)

[9] Management may waive fines for "understandable" reasons, such as a "car accident" or if entertainers provide a doctor's note. (Facts at ¶ 62.) Notably, however, it is always management's decision as to whether to waive such a fine.

[10] In fact, mandatory days per week or month aside, Onyx has even gone so far as to impose a tit-for-tat scheme on new hires, requiring them to work a certain number of days during mid-shift in order to be allowed to work the more lucrative night shift. (See Facts at ¶¶ 64-65.) This in no way resembles an independent contractor relationship.

When an entertainer arrives for her scheduled shift, she must sign in with the house mom. (Facts at ¶ 70.) The entertainer must then pay a fee for each shift they work. (Id. at ¶¶ 71-75.) On most days, the fees increase as the night wears on (id.), thereby limiting any meaningful discretion entertainers may be said to have with respect to when they arrive for work.

### 3. Appearance.

Onyx subjects entertainers to discipline for taking too much time in the dressing room (id. at ¶¶ 77-78), a factor that weighs in favor of employee status, Reich v. Circle C, 998 F.2d at 327, while at the same time, subjecting entertainers to certain appearance requirements. For example, entertainers cannot wear something management deems "inappropriate" (for example, sweatpants or clothing with political statements), may be told to cover scars, tattoos, or other disfigurements, and must do their hair in a manner management approves of. (Id. at ¶¶ 79-83.) Entertainers are also expected to maintain a weight approved of by management, as demonstrated by the "body check" portion of the hiring process (id. at ¶ 190), notices of corrective action issued for entertainers who fail to lose weight, and restrictions on entertainers' ability to dance on stage if management considers them overweight. (Id. at ¶¶ 84-84.) These restrictions unquestionably keep entertainers at Onyx from exerting control over a "meaningful part" of the

business, a key indication that an employment relationship exists.  Entertainers are unable to tailor their appearance to attract a particular kind of customer, such as men who prefer heavier women, or less made-up women, or some other specific sub-category.  Instead, they must tailor their appearance not to the preferences of their target customers, but to Onyx's requirements.  This control over entertainers' appearance runs counter to a finding of independent contractor status.  See Reich v. Circle C, 998 F.2d at 327.

### 4. Dancing and Disrobing.

Once dressed, entertainers perform personal dances for customers and dance on stage.  Unlike in a true independent contractor relationship where the contractor can negotiate her pay, the club, not the entertainers, sets the price customers pay for personal dances and tells customers how much money to throw on stage and when.  Compare (Facts at ¶¶ 5, 93-94) with Harrell, 992 F.Supp. at 1349 and Reich v. Circle C, 998 F.2d at 327 (finding these facts to cut in favor of employee status).

Similarly, Onyx decides when and in which order entertainers will dance on stage, having the DJ run a stage rotation during which the DJ calls entertainers on stage in the order in which they sign in with the house mom.   (Facts at ¶¶ 88-89.) Entertainers who arrive after 11:00 p.m. are not guaranteed a stage set and those who are late to stage may be fined.  (Id. at ¶¶ 87, 91.)  Notably, entertainers did not

participate in the establishment of this system. (See id. at ¶ 72.) Thus, as to dancing on stage—a plainly meaningful part of the job of an entertainer—the control lies with Onyx, not the entertainers.

Even once on stage, entertainers are subject to Onyx's requirements, dancing and disrobing as the DJ instructs. (Id. at ¶¶ 95-98.) Music selection, too, is controlled by the club. (Id. at ¶¶ 46, 164.) These are just more blatant examples of Onyx controlling the method by which entertainers perform their job at Onyx, all running contrary to economic independence. See Jeffcoat, 732 P.2d at 1076.

### 5. Check-Out Procedures.

Onyx's control over entertainers does not cease at Defendants' chosen closing time. Entertainers are not allowed to leave the club without following the nightly checkout procedure established by Onyx. (Facts at ¶¶ 102-116.) Entertainers are required to pay the house mom and DJ in order to leave, as well as to pay for and undergo a breathalyzer test.[11] (Id.) Entertainers are required to wait in line in order to leave, and may only do so once authorized to do so by Defendant, and even then, only in small groups. (Id. at ¶¶ 116.) This control is arguably more extensive than that in a typical employment relationship. Entertainers are essentially held captive, with Defendants as the literal gatekeepers

---

[11] "[Any] argument that [ ] rules were imposed to protect Plaintiffs and to ensure compliance with the law is unavailing."). Morse, 2010 WL 2346334 at *3.

to their ability to leave work.   The same cannot be said in an independent

contractor relationship.   See Johnson v. Unified Government of Wyandotte

County/Kansas City, Kansas, 371 F.3d 723, 729 (10th Cir. 2004) (freedom to come

and go as one pleases favors independent contractor status).

   In short, Onyx functions in a way that simply cannot support a finding of

independent contractor status.   Indeed, "[a] dancer can only be considered an

independent contractor if she exerts such control over a meaningful part of the

business that she stands as a separate economic entity.... In this case, the dancer's

economic status is inextricably linked to those conditions over which defendants

have complete control." Martin v. Priba, 1992 WL 486911 at *4 (internal citations

and quotations omitted).   Here, the most meaningful parts of the exotic dancing

occupation—appearance, pay, and manner of dance and disrobing—are dictated by

Defendants, not the entertainers, obliterating any argument that the entertainers are,

as a matter of economic reality, independent.[12]

---

[12] This result would not differ under the joint employer test, which has, in some
instances, been conflated with the economic realities employee status test. See
e.g., Perdomo, 2008 WL 4682616 at *1 (citing Antenor).  As to the joint employer
inquiry into the putative employer's power to hire or fire, modify the employment
conditions, or determine the pay rates or methods of pay for the workers, Charles,
169 F.3d at 1329, Defendants establish the prices that entertainers could charge
customers for their services, Defendants exercised complete control over hiring
decisions, and, as Defendants' decision to terminate the Named Plaintiffs for filing
suit plainly demonstrates, Defendants also exercised complete control over firing

## B.  AN ANALYSIS OF ENTERTAINERS' OPPORTUNITY FOR PROFIT OR LOSS INDICATES THAT THEY ARE EMPLOYEES.

In the context of adult entertainment clubs, the amount of money entertainers stand to gain or lose is generally a function of the actions the clubs, not the entertainers, take.  As stated by one court:

> Defendant would have us believe that a dancer [ ] could hang out her own shingle, pay nothing in overhead,-no advertising, no facilities, no bouncers,- and draw in a constant stream of paying customers.  A dancer [ ] risks little more than her daily "tip out" fee, the cost of her costumes, and her time.  That a dancer may increase her earnings by increased 'hustling' matters little.  As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.

Harrell, 992 F. Supp. at 1352.  And so it is the case here.  Defendants spend copious amounts of money on running Onyx.  (Facts at ¶¶ 184-185.)  Further, it is Defendants, not entertainers, that decide which customers can be in the club and when and to which customers the club will cater and market.  (Facts at ¶¶ 142-143,

---

decisions.  (Facts at ¶¶ 5, 29-30, 125-127.)  The other related joint employer factor of whether the putative employer undertook responsibilities ordinarily performed by employers, Charles, 169 F.3d at 1329, is also satisfied here, where Onyx drafted and maintained entertainer corrective action notices, set the price of dances, hours of club operation and cover charge, and provided for the building where entertainers were to work and necessary amenities (i.e., lighting, music, stage, poles, etc.).  Compare (Facts at ¶¶ 28, 36-37, 44, 46, 128-136, 142-151, 157-159, 164, 172, 174, 176-181) with Luna v. Del Monte Fresh Produce (Southeast), Inc., Case No. 06-CV-2000-JEC, 2008 WL 754452 (N.D. Ga., March 19, 2008).

157-159, 164.) Onyx, not the entertainers, runs the club's website and designs and pays for its advertisements, thereby controlling whether people hear about and want to frequent the club. (Id. at ¶¶ 144-151.) These and similar facts have been shown to weigh in favor of employee status. See Morse, 2010 WL 2346334 at *4; Reich v. Priba Corp., 890 F. Supp. 594; Reich v. Circle C., 998 F.2d at 328.

Further, at Onyx, it is the club, not the entertainers, that makes the decisions which determine in large part how much money customers will spend. Onyx provides cash to customers to use for paying for dances; when the cash runs out, dancers' incomes are affected. Onyx also sets the prices that customers must pay to enter and stay at the club (i.e., door fees, food and drink prices and drink minimums) as well as the price of a dance. (Facts at ¶¶ 154-156, 160.) All of these factors, particularly when combined with Onyx's advertising, which targets a particular socio-economic group, contribute to the amount of money an entertainer can make on any given shift. Naturally, then, whether and how much money an entertainer will make is largely a function of Onyx's actions, and not the entertainer's own business decisions.

Onyx also controls when and how entertainers can put themselves in the position to earn money. For example, entertainers are not free to simply go up on stage and dance; rather, they must abide by the mandatory stage rotation. (Id. at ¶¶

86-101.)  Similarly, although some entertainers at Onyx have been able to perform "birthday sets" during which they can keep all the money thrown on stage, Onyx has the ultimate say as to whether one is even allowed a birthday set.  (Id. at ¶¶ 165-169.)  Moreover, it was Onyx, and not the entertainers, who came up with the idea of a birthday set in the first place.  In this context, allowing entertainers to perform birthday sets is more like allowing employees a bonus than it is allowing them to run their own business.  Even once entertainers receive money during regular stage sets, Onyx, by requiring the even split of stage money and nightly payouts to the house mom and DJ, dictates how much of that money any given entertainer can keep.  (Id. at ¶¶ 99-101, 107-109.)

In a true contractual relationship, the tables would be turned, with entertainers holding the power and ability to determine how much they risk and stand to gain.  Given Onyx's constraints on this ability and Onyx's control over so many aspects related to profit and loss, it is plain that the entertainers in this case have very little independence and, rather, are economically dependent on Onyx.

## C.  THE DEGREE OF INVESTMENT IN THE EQUIPMENT OR MATERIALS REQUIRED FOR ENTERTAINERS TO WORK AT CLUB ONYX INDICATES THAT ENTERTAINERS ARE EMPLOYEES.

Here, certainly, entertainers spent money in order to work at Onyx.  (Facts at ¶¶ 37-46, 57-60, 70-75, 78, 91, 96-97, 103, 106-109, 111-112, 130, 136-141.)  But

the fact that they spent money on house fees and fines imposed by Defendants, costumes, and makeup does not tip the scales in favor of independent contractor status on this factor.  See Morse, 2010 WL 2346334 at *5.  The inquiry into investment in a business is not a calculation to be processed according to a preset formula.  See Tafalla v. All Florida Dialysis Servs., Inc., No. 07-80396-CIV, 2009 WL 151159, at *5 (S.D. Fla. Jan. 21, 2009) (analyzing the related issue of joint employer status, and determining that "a joint employment relationship is not determined by a mathematical formula.").  The question is whether any investments on the part of the entertainers indicate economic independence, rather than dependence on the club.[13]

_____

[13] That said, even, when looking at the type and degree of investments, numerous other courts have held that entertainers' investments are truly minimal in comparison to that of the club's.  Harrell, 992 F. Supp. at 1350 ("The courts which have addressed this factor have universally concluded that a dancer's investment is minor when compared to the club's investment.").  In Harrell, the court found the "relative investment" factor to cut in favor of economic dependence even where the named plaintiff had spent $1,000 in costumes in a six-month period, $130 per month on make-up, and $65 per month on shoes.  Id.  See also Jeffcoat, at 1077 ("Courts have found employee status even where welding equipment worth **several thousand dollars** was purchased by the worker, where the major part of the worker's time was spent in a manner not requiring use of the investment.") (internal citations and quotations omitted) (emphasis added).  Here, given Defendants' expenditures ███████ and Plaintiffs' complete lack of capital expenditures (Compare Facts at ¶¶ 184-185 with Facts at ¶ 171), no different finding is warranted in this case.

17

Here, the analysis indisputably shows that entertainers are economically dependent on Onyx. It is Onyx, not the entertainers, that provides the club, stage, and poles on which the entertainers dance. (Facts at ¶¶ 172, 176, 177-178.) It is Onyx, not the entertainers, that employs the bartenders, waitresses, doormen, floormen, and managers that service the club. (Id. at ¶¶ 28, 174.) It is Onyx, not the entertainers, that hires and instructs the house mom and DJ. (Id. at ¶¶ 36-37, 44, 46.) It is Onyx, not the entertainers, that provides for security, advertising, maintenance, repairs, amenities, and insurance at the club. (Id. at ¶¶ 143-151, 177-181.) In short, "but for [D]efendants' provision of the lavish work environment, the dancers at the club likely would earn nothing." Martin v. Priba, 1992 WL 486911 at * 5; accord Reich v. Priba, 890 F. Supp. at 593; see also Morse, 2010 WL 2346334 at *5 ("[T]he Plaintiffs do not make any capital investment in Defendant's facilities, advertising, maintenance, security, staff, sound system and lights, food, beverage, and other inventory.... Thus, as in *Circle C*, this factor tips in favor of employee status.") (internal citations and quotations omitted); Reich v. Circle C., 998 F.2d at 328.

Onyx, not the entertainers, has invested in making sure the club runs.[14] Thus, entertainers are dependent on Onyx's investments to ensure that they have a place to work. Here, as in the numerous cases cited above, this factor cuts in favor of employee status.

## D. ENTERTAINERS PERFORM UNSKILLED WORK AT CLUB ONYX, INDICATING EMPLOYEE STATUS.

To be an entertainer at Onyx, the primary requirement is that one have a fit body and be attractive. (Facts at ¶¶ 186-196 ("[I]t's nothing really to it. You just have to be pretty.").) In short, it is appearance, not skill, that gets one a job as an adult entertainer. Indeed, courts have consistently held that there is little to no skill required to be a nude dancer. See Morse, 2010 WL 2346334 at *5 (citing Reich v. Circle C., 998 F.2d at 328; Harrell, 992 F.Supp. at 1351; Reich v. Priba, 890 F. Supp. at 593; and Jeffcoat, 732 P.2d at 1077).

In Morse, the court found entertaining to be unskilled work where the entertainers were required to audition by dancing to two to three songs and were

---

[14] The related factor of control of the premises under the related joint employer test also weighs in favor of employee status in this case. See Charles, 169 F.3d at 1329. Here, Defendants' control of the premises where Onyx is located is made obvious not only by Defendants' decision to ban Plaintiffs from the premises in conjunction with their termination and Defendants' control over which customers can be present and when they can be present in the club, but also by Defendant Pony Tail's admissions that it has leased the premises where Onyx is located at all times since July of 2006, and that it owns and controls Onyx. (Facts at ¶¶ 125-127, 155-159, 173.)

required to present sufficient identification. 2010 WL 2346334 *1. At Onyx, aside from an examination of an applicant's body for stretch marks or other appearance-related factors, the hiring requirements are no greater than those in Morse. (Facts at ¶¶ 186-196.) That Onyx does not inquire into entertainers' previous dance experience (id. at ¶¶ 186-188) is also telling of how little training or experience matters to be an entertainer. See Jeffcoat, 732 P.2d 1073 ("The Club, however, hired dancers without knowing whether or not they had danced previously. Apparently the skill required for topless dancing was slight.").

Regardless, whether entertainers actually had previous dance training or experience is immaterial to whether entertainers performed skilled work. See Reich v. Priba, 890 F.Supp. at 592 ("There was no evidence that any specialized skills were a requirement to perform at the club even though some of the entertainers stated that they had participated in dance lessons."). In sum, the act of striptease is simply not skilled work and nothing about Onyx's hiring requirements or expectations of their entertainers raises it to that level.[15]

---

[15] Notably, this factor of the economic realities test has been read to extend beyond the common sense meaning of the word "skill," with some courts construing this factor to require an **independent** use of a technical skill. See Brock v. Superior Care, Inc., 840 F.2d 1054, 1060 (2d Cir. 1988) ("[T]he fact that workers are skilled is not itself indicative of independent contractor status," rather they must use these skills in an "independent way" for this factor to lean in favor of an independent contractor status). Here, even if entertainers were arguably performing skilled

### E. THE DEGREE OF PERMANENCY AND DURATION OF THE ENTERTAINERS' RELATIONSHIP WITH ONYX INDICATES THAT ENTERTAINERS ARE EMPLOYEES.

The inquiry as to this factor of the economic realities test is whether the relationship at issue is more contractual or more like that of at-will employment for an unlimited duration. See Doe v. Cin-Lan, Inc., No. 08-cv-12719, 2008 WL 4960170, at * 11 (E.D. Mich. Nov. 20, 2008). Here, the evidence shows that entertainers' relationship with Onyx is much more like the latter.

Most of the Named Plaintiffs worked for Onyx for multiple years and Defendants have admitted that Onyx has some entertainers who have performed at Onyx for an excess of one year.[16] (Facts at ¶¶ 197-209.)  Further, Onyx's scheduling requirements—i.e., the requirement to work a minimum number of days per week and slow days per month in order to avoid fines—demonstrate the permanence of the employment relationship.  (Id. at ¶¶ 47-69.)  These requirements, paired with the fact that entertainers were required to adhere to preset schedules in order to avoid paying fines, effectively prevented Plaintiffs from securing meaningful employment elsewhere. (Id.) Indeed, Onyx has fired

---

work, those skills are not used in an independent manner at Onyx; rather, Onyx brings the customers to the club and entertainers dance for them. (See supra Section III(B).)

[16] In fact, many entertainers consider Onyx their "home club," meaning that, though they may at times work at other clubs, their base or home is Onyx. (Facts at ¶ 210.)

entertainers for working at other clubs during times they were scheduled to work at

Onyx. (Id. at ¶ 211.) These facts demonstrate an at-will employment relationship

of unlimited duration rather than a contractual relationship.[17]

## F. ENTERTAINERS PERFORM A TASK THAT IS AN INTEGRAL PART OF CLUB ONYX'S BUSINESS, INDICATING EMPLOYEE STATUS.

It is well-known in and around Atlanta that Onyx is a strip club featuring

nude dancers. (Facts at ¶¶ 2, 212.) There really is no doubt, then, that nude

dancers—Onyx's entertainers—are integral to the business.   Indeed, the

entertainers draw business to the club, with the club going so far as to discipline

entertainers for depriving Onyx of business by not interacting with customers. (Id.

at ¶¶ 220.)

---

[17] Defendants will likely point to the generally transient nature of the entertainer population in arguing against the logical conclusion that entertainers are employees; however, this is not an argument that defeats a finding of employee status under the FLSA. Any analysis of degree of permanency and duration of the parties' relationship must make allowances for the uniquely transient nature of the business. See Martin v. Priba, 1992 WL 486911 at *5 (rejecting defendants' position that dancers are independent contractors and stating, as to this factor, "Because dancers tend to be itinerant, the court must focus on the nature of their dependence... even if the freedom to work for multiple employers may provide something of a safety net, unless a worker possesses specialized and widely-demanded skills, that freedom is hardly the same as true economic independence.") (internal citations and quotations omitted); accord Reich v. Priba Corp., 890 F.Supp at 594; see also Harrell, 992 F.Supp. at 1352 (placing less emphasis on the permanency factor). As one Court of Appeals has stated, "the transient nature of the work force is not enough here to remove the dancers from the protections of the FLSA." Reich v. Circle C. Investments, Inc., 998 F.2d at 328-329. This Court should find the same.

Further, the centrality of the entertainers' presence is demonstrated by the club's layout: Onyx provides three stages on which entertainers dance, with the main stage visible from almost every location in the club. (Id. at ¶¶ 214-216.) This is telling. See Chaves, No. 07-2505 at *7 (noting, in ruling that defendant is in the adult entertainment business, that "the stage where the dancers perform is in the center of the strip club side of the facility and is in direct view of those patrons.")

Onyx's own marketing is equally illustrative on this point, with its website and billboard making clear that scantily clad women are at the heart of the business. (Facts at ¶¶ 217, 225-226.) Similarly, Onyx holds itself out to the public as an adult entertainment club by registering for adult entertainment licenses, advertising in a publication geared to the adult entertainment community, and seeking managers who have had previous experience working in the adult entertainment community. (Id. at ¶¶ 221-224.)

Notably, the fact that Onyx also provides liquor and music to customers is not enough to support a claim that it is the liquor and music artists that are integral to the business, not entertainers. Rejecting this type of argument, courts have reasoned that even if liquor sales are high, people are likely choosing the club as opposed to any other bar because of the presence of naked women. Morse, 2010

WL 2346334 at *6 (*quoting* Harrell, 992 F.Supp. at 1352); Chaves, No. 07-2505 at *7-8 ("While it may be true that the bulk of King Arthur's revenue is derived from alcohol sales as distinguished from stage dancing, the dancers perform and interact with patrons in the direct furtherance of those sales. The sale of alcohol and the exotic dancing, together and intertwined, both clearly comprise the adult entertainment portfolio of King Arthur's."). Even Onyx's own advertisements about liquor blatantly show how intertwined liquor and nude dancers are at Onyx. (Facts at ¶ 217; see also Facts at ¶ 218 (as to other online postings.).) Identical reasoning applies to any argument that Onyx is simply a venue for people to listen to music or see celebrity artists.

To put it bluntly, strippers are integral to strip clubs. Morse, 2010 WL 2346334 at *6 ("[E]xotic dancers are obviously essential to the success of a topless nightclub.") (quoting Harrell, 992 F.Supp. at 1352). And Onyx is admittedly a strip club. (Id. at ¶¶ 2, 212.) Thus, there is no credible argument that Plaintiffs and Onyx's other entertainers are anything but integral to Onyx's business.

## CONCLUSION

For all of these reasons, the Court should grant Plaintiffs' Motion.

Dated: October 14, 2010

NICHOLS KASTER, PLLP

/s/ Anna P. Prakash
Donald H. Nichols (GA Bar No. 450212)
E. Michelle Drake (GA Bar No. 229202)
Steven Andrew Smith
(MN Bar No. 260836)
  *Admitted Pro Hac Vice*
Anna P. Prakash (MN Bar No. 0351362)
  *Admitted Pro Hac Vice*
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 338-4878

and

CAMPANO & SPERLING
Jennifer K. Mason (GA Bar No. 42418)
3175 Shallowford Road
Chamblee, GA 30341
Work Phone (770) 458-4477
Fax (770) 458-7663

ATTORNEYS FOR PLAINTIFFS