# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

Karenza Clincy, Jammie Parker,
Kiesha Pough, Kimberly Jordan,
Naturee Wells, Monica Leaphart,
and Summer Sales, Individually
and on behalf of others similarly
situated,

              Plaintiffs,

v.

Galardi South Enterprises, Inc.
d/b/a/ The Onyx, Galardi South
Enterprises Consulting, Inc.
d/b/a/ The Onyx, Pony Tail, Inc.
d/b/a/ The Onyx, Michael Kapp
and Jack Galardi,

              Defendants.

**PLAINTIFFS' STATEMENT
OF UNDISPUTED FACTS IN
SUPPORT OF MOTION FOR
PARTIAL SUMMARY
JUDGMENT**

Court File No. 09-CV-2082 (RWS)

## UNDISPUTED FACTS RELATED TO CLUB ONYX'S BUSINESS

1.     At all times since July 2006 ("class period"), the business located at

1888 Cheshire Bridge Road in Atlanta has been operating as Club Onyx ("Onyx").

(**Ex. 2:** Williams Feb. 3 Dep. at 12, 59.[1],[2])

---

[1] All deposition or meeting transcripts, correspondence, and other discovery cited
herein are prefaced by a bolded exhibit number and attached to the Affidavit of
Anna P. Prakash, filed in support of Plaintiffs' Motion for Partial Summary

2.     Onyx is a strip club that features nude dancers ("entertainers") (**Ex. 3:** Adams Dep. at 56; Named Plf. Decs.[3] at ¶ 3.)

3.     Each of the Named Plaintiffs in this action has worked as an entertainer at Onyx during the class period. (Named Plf. Decs. at ¶ 1.)

4.     Entertainers' primary job duties are to perform personal dances, during which they disrobe, for customers on the main floor of the club and dance on stage. (**Ex. 2:** Williams Feb. 3 Dep. at 46.)

5.     Onyx sets the price of table dances at $10 and entertainers cannot negotiate this price with customers. (**Ex. 4:** Leaphart Dep. at 90-91; **Ex. 5:** Wells

Judgment.    All declarations or affidavits cited herein are filed as separate documents in support of Plaintiffs' Motion for Partial Summary Judgment.
[2] Dennis Williams, the 30(b)(6) designee for all three corporate Defendants in this case, testified on February 3, 2010 on behalf of Defendant Pony Tail, Inc. and on February 10, 2010 on behalf of Defendants Galardi South Enterprises Consulting, Inc. ("GSEC") and Galardi South Enterprises, Inc. ("GSE"). (See generally **Ex. 2:** Williams Feb. 3 Dep.; **Ex. 9:** Williams Feb. 10 Dep.)   Mr. Williams has been Secretary and Executive Vice President of Defendant Pony Tail, Inc. throughout class period and is also a corporate officer of Defendants GSE and GSEC. (**Ex. 2:** Williams Feb. 3 Dep. at 6, 14.)  Mr. Williams reports directly to Defendant Jack Galardi, functioning as his "eyes and ears" with respect to the interests of Mr. Galardi's various clubs, including Club Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 7; **Ex. 9:** Williams Feb. 10 Dep. at 22-23.)  Mr. Williams offices out of the "corporate office" described below. (**Ex. 9:** Williams Feb. 10 Dep. at 9.)
[3] Referencing the August 13 Declarations of Named Plaintiffs Monica Leaphart, Naturee Wells, Summer Sales, Jammie Parker, Kiesha Pough, Kimberly Jordan, and Karenza Clincy.

Dep. at 44; **Ex. 6:** Clincy Dep. at 95; **Ex. 7:** Pough Dep. at 70; **Ex. 8:** Parker Dep. at 87.)

6.    All entertainers who perform at Onyx have been characterized as independent contractors throughout the class period.  (**Ex. 2:** Williams Feb. 3 Dep. at 8.)

7.    Defendant Jack Galardi, together with the General Counsel of Defendant Pony Tail, Inc. made the decision to classify entertainers at Onyx as independent contractors.  (**Ex. 2:** Williams Feb. 3 Dep. at 32.)

8.    Onyx does not pay entertainers wages or include them in payroll. (**Ex. 2:** Williams Feb. 3 Dep. at 75-76.)

9.    Rather, to earn money for working at Onyx, entertainers rely solely on tips from customers.  (See id.; Sales Dec. at ¶ 53; Pough Dec. at ¶ 49; Parker Dec. at ¶ 51; Leaphart Dec. at ¶ 54; Jordan Dec. at ¶ 52; Clincy Dec. at ¶ 48; Wells Dec. at ¶ 53.)

10.    At no time during the class period has the money that entertainers receive from customers been included in Defendant Pony Tail's gross receipts. (**Ex. 2:** Williams Feb. 3 Dep. at 72-73, 80.)

## UNDISPUTED FACTS RELATED TO THE RELATIONSHIP AND ORGANIZATION OF DEFENDANTS

11.    Defendants claim that the Defendant Pony Tail, not any of the other Defendants, is the entity that would be the employer of Onyx's entertainers, including the Named Plaintiffs, in the event this Motion is granted.  (See Williams Aug. 25, 2009 Dec.; **Ex. 10:** Murphey Aug. 25, 2009 Let.)

12.    Defendants further claim that throughout the class period, Defendants GSE and GSEC have been mere flags or handles for the "corporate office" located at 1730 Northeast Expressway in Atlanta, Georgia.  (**Ex. 9:** Williams Feb. 10 Dep. at 6-8, 15-16; **Ex. 11:** Pepper Dep. at 12.)

13.    1730 Northeast Expressway in Atlanta, Georgia is the business address for the Named Corporate Defendants, Pony Tail, Inc. ("Pony Tail"), Galardi South Enterprises, Inc. ("GSE"), and Galardi South Enterprises Consulting, Inc. ("GSEC").  (**Ex. 9:** Williams Feb. 10 Dep. at 6-8, 15-16; **Ex. 11:** Pepper Dep. at 12.)

14.    Defendant Jack Galardi ("Galardi") is CEO and shareholder of each of the three Named Corporate Defendants and owns a controlling interest in each. (**Ex. 9:** Williams Feb. 10 Dep. at 26; **Ex. 12:** Pony Tail Interrog. Resp. No. 2.)

15.    Defendant Jack Galardi owns several clubs, including Onyx, that "answer" to the corporate office.  (**Ex. 9:** Williams Feb. 10 Dep. at 17.)

16.    Many of the clubs that answer to the corporate office, including Onyx, are listed on the website www.showbars.com, which is maintained by the "corporate office." (**Ex. 9:** Williams Feb. 10 Dep. at 17-18; **Ex. 2:** Williams Feb. 3 Dep. at 27.)

17.    Defendants Jack Galardi and Michael Kap[4] ("Kap") have offices at the corporate office. (**Ex. 9:** Williams Feb. 10 Dep. at 9; **Ex. 13:** Hayes Dep. at 17.)

18.    Defendant Kap is known as the Chief Operating Officer of GSEC and was handpicked for this role by Defendant Galardi. (**Ex. 9:** Williams Feb. 10 Dep. at 21-22.)

19.    Defendant Kap acts as Defendant Galardi's "eyes and ears" in his various clubs, including Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 96; **Ex. 9:** Williams Feb. 10 Dep. at 23, 39 (explaining how Kap's duties are dictated by Defendant Galardi).)

20.    In other words, Defendant Kap's duties include conveying Defendant Galardi's directions to the clubs, including Onyx, and informing Defendant Galardi about any issues with management or entertainers, policy-making, maintenance,

---

[4] Though, identified as "Michael Kapp" in the Caption, Defendant's name is spelled "Kap." (See generally **Ex. 14:** Defendant Kap's Responses to Plaintiffs' First Set of Discovery.)

repairs on the buildings, and potential acquisition of future properties related to or at the clubs, including Onyx. (**Ex. 9:** Williams Feb. 10 Dep. at 21-24.)

21.    Named Plaintiff Monica Leaphart went with another entertainer to the "corporate office" on one occasion and met with Defendant Kap in the hopes of resolving a dispute involving an entertainer at Onyx. (**Ex. 4:** Leaphart Dep. at 187-189.)

22.    The other individuals who work at the corporate office include an office manager, payroll secretary, three other secretarial staff, an accountant, the director of security, Mr. Williams, and the marketing director. (**Ex. 9:** Williams Feb. 10 Dep. at 9.)

23.    The individuals who work in the corporate office, including Defendant Kap, are paid through Defendant Galardi's various corporations as decided by Defendant Galardi, or paid directly by Defendant Galardi himself. (**Ex. 9:** Williams Feb. 10 Dep. at 34-35.)

## UNDISPUTED FACTS RELATED TO MANAGEMENT OF ONYX

Undisputed Facts Related to Managers at Onyx

24.    At all times since July 2006 ("class period"), the formal management team at Onyx has included a night manager, relief manager, and general manger.[5] (**Ex. 2:** Williams Feb. 3 Dep. at 18-19.)

25.    Managers at Onyx are usually interviewed by Defendant Michael Kap and the ultimate hiring decision is made by Defendant Jack Galardi.  (**Ex. 2:** Williams Feb. 3 Dep. at 13.)

26.    Rick Hayes has worked in a management position at Onyx throughout the class period and has been the General Manager at Onyx since 2008.  (**Ex. 13:** Hayes Dep. at 5-7; **Ex. 2:** Williams Feb. 3 Dep. at 20.)

27.    Cliff Adams is presently the night manager at Onyx, and has held that position since 2008.  (**Ex. 2:** Williams Feb. 3 Dep. at 18; **Ex. 3:** Adams Dep. at 5-6.)  Prior to being night manager, Mr. Adams worked as "security" at Onyx.[6]  (**Ex. 3:** Adams Dep. at 6.)

---

[5] References to "management" or "managers at Onyx," throughout this Statement of Undisputed Facts, are meant to refer to this team.

[6] The terms "security," "floor staff," "floor managers," "floormen," and "door staff" are used interchangeably throughout this Motion and in the club environment. (**Ex. 2:** Williams Feb. 3 Dep. at 41; **Ex. 13:** Hayes Dep. at 61.)

28.    Managers are responsible for hiring entertainers and other staff, including bartenders, waitresses, and floormen. (**Ex. 2:** Williams Feb. 3 Dep. at 36, 41; **Ex. 13:** Hayes Dep. at 7, 14-15 (testifying to consulting with house mom and DJ about whether to hire entertainers).)

29.    Management also has the authority to suspend entertainers. (**Ex. 15:** Swinger Dep. at 29; **Ex. 3:** Adams Dep. at 60.)

30.    Management, on their own, too, as well as Defendant Galardi and Defendant Kap at the direction of Defendant Galardi, have the ability to fire entertainers. (**Ex. 3:** Adams Dep. at 60-61; **Ex. 2:** Williams Feb. 3 Dep. at 37; **Ex. 12:** Pony Tail Admission No. 8; see also **Ex. 9:** Williams Feb. 10 Dep. at 24-25 (testifying that Defendant Galardi has authority to fire entertainers as CEO of GSE and GSEC).)

31.    Management has sought the house mom[7] Sabrina Swinger's opinion as to suspension and other discipline. (**Ex. 15:** Swinger Dep. at 28-29.)

32.    Swinger would recommend suspension if an entertainer had problems with drugs or was simply causing problems in the dressing room in a way that could impact the morale of other entertainers. (**Ex. 15:** Swinger Dep. at 28-29.)

---

[7] An explanation of "house moms" is provided below. (See *infra* at ¶¶ 37-45.)

33.    At one point during the last three years, Onyx management also allowed floormen to impose fines on entertainers if they were breaking laws or if they were rude or getting into arguments or potential fights with customers. (**Ex. 3:** Adams Dep. at 32.)[8]

34.    Some of managers' other duties include making sure that entertainers follow Onyx's policies and rules, as well as the rules of the City of Atlanta, and supervising entertainers on a day-to-day basis. (**Ex. 3:** Adams Dep. at 8, 11; **Ex. 2:** Williams Feb. 3 Dep. at 36-37.)

35.    The day-to-day operational decisions at Onyx are made by club management, unless Defendant Kap conveys specific instructions from Defendant Galardi. (**Ex. 2:** Williams Feb. 3 Dep. at 17.)

36.    Managers are also responsible for hiring "house moms." (**Ex. 2:** Williams Feb. 3 Dep. at 41; **Ex. 15:** Swinger Dep. at 6; **Ex. 13:** Hayes Dep. at 90; **Ex. 3:** Adams Dep. at 21.)

---

[8] Indeed, if other Onyx staff (i.e., waitresses or bartenders) see entertainers doing something inappropriate, they are to alert the floor manager. (**Ex. 13:** Hayes Dep. at 60-61.)   The floormen also have other duties, which generally include maintaining the entertainers' safety and handling rowdy customers. (**Ex. 13:** Hayes Dep. at 61.) If a customer is behaving inappropriately with an entertainer, the entertainer is to alert a floor manager. (**Ex. 13:** Hayes Dep. at 60.) If a customer does not pay for a dance, entertainers are to alert the floor manager. (**Ex. 13:** Hayes Dep. at 60.)

Undisputed Facts Related to House Moms and Disc Jockeys at Onyx

37.    There are presently four house moms at Onyx, all of whom report to the General Manager.  (**Ex. 13:** Hayes Dep. at 46, 90; **Ex. 3:** Adams Dep. at 20 (as to supervising house moms).)

38.    Defendant Pony Tail characterizes the "house moms" as independent contractors.  (**Ex. 2:** Williams Feb. 3 Dep. at 8.)

39.    House moms work directly with the entertainers, splitting their time between the dressing room and the floor of the club.  (**Ex. 15:** Swinger Dep. at 14-15.)

40.    House moms are generally responsible for signing entertainers in when they arrive, making sure entertainers are ready to go on stage, making sure there are no problems in the dressing room, and maintaining the cleanliness of the dressing room.  (**Ex. 15:** Swinger Dep. at 13.)

41.    Sabrina Swinger is currently a house mom at Onyx, and has been since mid-2007.  (**Ex. 15:** Swinger Dep. at 6-7.)

42.    Ms. Swinger holds herself out as and considers herself and the other house moms to be the entertainers' "direct managers." (**Ex. 15:** Swinger Dep. at 7-8, Ex. 1.[9])

43.    If an entertainer has too much "attitude" or is causing problems with the other entertainers, Ms. Swinger will talk to the entertainer and try to resolve the problem. (**Ex. 15:** Swinger Dep. at 13.)

44.    If management wants to talk to an entertainer, Ms. Swinger will go get the entertainer for the manager. (**Ex. 15:** Swinger Dep. at 15.)

45.    Ms. Swinger also has disciplinary authority over entertainers. (See *infra* at ¶¶ 128, 132; see e.g., **Ex. 15:** Swinger Dep. Exs. 2, 5-11.)

46.    There are also disc jockeys ("DJs") that work at Onyx, providing the music that entertainers are required to dance to, and providing instruction to entertainers dancing on stage. (See generally Named Plf. Decs.)

---

[9]    All unbolded exhibit citations herein reference exhibits within the cited deposition.    For example, here, Exhibit 1 to Ms. Swinger's deposition is included and labeled within Exhibit 15 to the Affidavit of Anna P. Prakash.

## UNDISPUTED FACTS RELATING TO ONYX'S METHODS OF CONTROL OVER ENTERTAINERS

Undisputed Facts Related to Onyx's Scheduling Requirements

47.    Entertainers who work at Onyx must work during the business hours established by Defendant Jack Galardi.  Entertainers have no role in deciding Onyx's business hours.  (**Ex. 2:** Williams Feb. 3 Dep. at 39-40.)

48.    Onyx management decides the hours of each shift that entertainers are permitted to work.  (**Ex. 2:** Williams Feb. 3 Dep. at 40-41.)

49.    Entertainers are required to sign up for shifts (i.e., draw up their work schedule) during the preceding week; such schedules are posted in the management office and the dressing room at Onyx.  (**Ex. 15:** Swinger Dep. at 85-86; see e.g., **Ex. 15:** Swinger Dep. at Ex. 21; **Ex. 13:** Hayes Dep. at Ex. 25.)

50.    Entertainers are generally required to work four days a week, and are fined or otherwise disciplined for working fewer days.  (**Ex. 15:** Swinger Dep. at 33-34, 90-91 (testifying to entertainers having to pay a higher bar fee if they only want to work a certain day a week); **Ex. 3:** Adams Dep. at 92.)

51.    For example, Onyx management completed a "notice of corrective action" (discussed below) for Named Plaintiff Karenza Clincy when she failed to sign up for shifts in advance.  (**Ex. 15:** Swinger Dep. at 32-33, Ex. 6.)

52.    The requirement that entertainers work four days a week may be waived only with management's permission.  (**Ex. 15:** Swinger Dep. at 33-34 (testifying that Onyx may allow an entertainer to work three days a week if the entertainer is in school and can demonstrate as much with a school transcript); **Ex. 13:** Hayes Dep. at 25 ("We do **allow** a lighter schedule if you are in school") (emphasis added); accord **Ex. 3:** Adams Dep. at 92.)

53.    Named Plaintiffs Karenza Clincy and Kiesha Pough, for example, were allowed to work three days a week because they were in school.  (**Ex. 6:** Clincy Dep. at 43-44; **Ex. 7:** Pough Dep. at 46-47.)

54.    Entertainers do not always have the discretion to choose which of the mandatory three or four days they work.  (**Ex. 6:** Clincy Dep. at 45.)

55.    Management sometimes requires proof that an entertainer had obligations preventing her from working when determining whether to fine or discipline an entertainer for failing to work required or scheduled days.  (**Ex. 6:** Clincy Dep. at 46 (testifying to bringing in notes from teachers or obituaries); **Ex. 8:** Parker Dep. at 160 (testifying to bringing in an obituary to prove she had been at a funeral).)

56.    Additionally, entertainers are required to work a certain number of "slow days" [10] per month. (**Ex. 3:** Adams Dep. at 37; **Ex. 15:** Swinger Dep. at 73.)

57.    All of the Named Plaintiffs have been subject to fines for failing to work the required days a week or month. (Parker Dec. at ¶ 26; Clincy Dec. at ¶ 26; **Ex. 5:** Wells Dep. at ¶ 93-94; **Ex. 4:** Leaphart Dep. at 139-140; **Ex. 17:** Sales Dep. at 58; **Ex. 7:** Pough Dep. at 69; **Ex. 16:** Jordan Dep. at 94-95; see also Martin Dec. at ¶ 27; Bloedoorn Dec. at ¶ 27; Jefferson Dec. at ¶ 27; Appling Dec. at ¶ 26; Hughes Dec. at ¶ 25.)

58.    Entertainers are also fined for not working the required number of slow days each month. This is true even if an entertainer was out of town or on vacation during the month. (**Ex. 3:** Adams Dep. at 36; **Ex. 15:** Swinger Dep. at 73, 86-87; **Ex. 7:** Pough Dep. at 152-153; see e.g., **Ex. 6:** Clincy Dep. at 129.)

59.    If entertainers do not come to work on nights they are scheduled to work and do not call ahead ("no call no show"), they are fined or otherwise disciplined. (**Ex. 13:** Hayes Dep. at 50; **Ex. 3:** Adams Dep. at 35-36; see also **Ex. 12:** Pony Tail Admission No. 3.)

---

[10] In Atlanta, certain nights are known for being busier than others. The typically non-busy days of the week are referred to as "slow days." Slow days at Onyx are Mondays and Wednesdays. (**Ex. 3:** Adams Dep. at 37.)

60.     Entertainers are also fined or otherwise disciplined even if they call to say that they will not be working a scheduled shift. (**Ex. 13:** Hayes Dep. at 26; <u>see</u> <u>e.g.,</u> **Ex. 6:** Clincy Dep. at 113-114; **Ex. 4:** Leaphart Dep. at 133; **Ex. 5:** Wells Dep. at 94; **Ex. 17:** Sales Dep. at 66; **Ex. 7:** Pough Dep. at 92-93; **Ex. 16:** Jordan Dep. at 41 (all fined for not coming to work when scheduled, some even after calling to report an upcoming absence).)

61.     As an example of other discipline, Onyx's general manager has fired entertainers for working at another club if that work was during a time they were scheduled to work at Onyx. (**Ex. 13:** Hayes Dep. at 86.)

62.     Only management has the discretion to waive fines for failing to work a required shift. (**Ex. 2:** Williams Feb. 3 Dep. at 47-48; **Ex. 13:** Hayes Dep. at 26 (testifying that for a call out fine to be waived, it must be "understandable, such as a car accident, doctor's notice….").)

63.     Additionally, only management has the discretion to tell entertainers which shifts they are allowed to work. (**Ex. 13:** Hayes Dep. at 82-83 (testifying to telling an entertainer that she can only work the day shift until she loses weight).)

64.     Onyx, for example, required Plaintiff Karenza Clincy to work 30 days on mid-shift in order to work night shifts when she first started. (**Ex. 6:** Clincy Dep. at 32-34.)

15

65.    Similarly, Plaintiff Wells was required to work the day shift for a month when she first started at Onyx. (**Ex. 5:** Wells Dep. at 25-26.)

66.    If entertainers arrive to work after a certain time, management has used its discretion to send them home. (**Ex. 3:** Adams Dep. at 34; **Ex. 15:** Swinger Dep. at 88, Ex. 21.)

67.    On one occasion, Plaintiff Karenza Clincy requested permission to arrive for work after 11:00 p.m., and management denied the request. (**Ex. 6:** Clincy Dep. at 49-50.)

68.    On some occasions when they have arrived after 11:00 p.m., Plaintiffs Leaphart and Wells have been told that they cannot dance. (**Ex. 4:** Leaphart Dep. at 63-64; **Ex. 5:** Wells Dep. at 32.)

69.    Similarly, Plaintiff Parker has been sent home by management for arriving to work later in the evening. (**Ex. 8:** Parker Dep. at 110.)

House or Bar Fees[11]

70.    When entertainers arrive for their shift at Onyx, they are expected to go to the dressing room and report to the house mom, who then records their name and arrival time on a paper list. (**Ex. 13:** Hayes Dep. at 41; **Ex. 4:** Leaphart Dep. at 79.)

---

[11] These terms are used interchangeably throughout this Statement of Facts and in the club environment. (Named Plf. Decs. at ¶ 8.)

71.    At all times since July of 2006, entertainers have been required to pay in order to work at Onyx and this payment is known as a "house fee" or "bar fee." Entertainers are expected to pay the house fee when they report to the house mom, as opposed to owing the fee over time. (**Ex. 13:** Hayes Dep. at 26, 42 (testifying to management discretion in this regard); **Ex. 3:** Adams Dep. at 72, 92; **Ex. 15:** Swinger Dep. at 18-19 (testifying to house moms being required by Onyx management to inform entertainers of this); see e.g., **Ex. 15:** Swinger Dep. Ex. 3 (text message to entertainers).)

72.    The house fee schedule was established by Defendants and has been the same since at least mid-2008.  At any given time since, there is only one house fee schedule in place.  All entertainers pay the same house fees as one another. (**Ex. 13:** Hayes Dep. at 42-43; **Ex. 3:** Adams Dep. at 72; Named Plf. Decs. at ¶ 12.)

73.    The current house fee schedule is as follows:

> *Monday*
> $29 regardless of arrival time
>
> *Wednesday*
> $45 regardless of arrival time
>
> *Tuesday, Thursday, Saturday*
> $45 if entertainer arrives between 8:00 p.m. and 9:00 p.m.
> $75 if entertainer arrives between 9:00 p.m. and 10:00 p.m.
> $100 if entertainer arrives between 10:00 p.m. and 11:00 p.m.
>
> *Sunday:* Closed

(**Ex. 13:** Hayes Dep. at 42; **Ex. 12:** Pony Tail Interrog. Resp. No. 2, Set II.)[12]

74.    The house fees that entertainers pay go directly to LVA Management and Consulting, Inc., which is a separate closely held corporation of Defendant Jack Galardi's. (**Ex. 2:** Williams Feb. 3 Dep. at 83-84.)

75.    All of the Named Plaintiffs have been required to pay house fees to work at Onyx. (Named Plf. Decs. at ¶ 8; see also Bloedoorn Dec. at ¶ 9; Jefferson Dec. at ¶ 9; Martin Dec. at ¶ 9; Appling Dec. at ¶ 8; Hughes Dec. at ¶ 9.)

Undisputed Facts Related to Dressing Room and Attire

76.    Once entertainers have signed in with the house mom and paid their bar fee, they start to get dressed. (**Ex. 3:** Adams Dep. at 72.)

77.    Onyx makes it clear to entertainers that it wants entertainers dressed and working quickly.    (**Ex. 15:** Swinger Dep. at 21 (testifying to wanting entertainers out on the floor within an hour); see also **Ex. 4:** Leaphart Dep. at 79-80; **Ex. 5:** Wells Dep. at 32-33; **Ex. 8:** Parker Dep. at 67-68; **Ex. 6:** Clincy Dep. at 86 (testifying to having to "leave out the dressing room unfinished").)

78.    In fact, Onyx has written up notices of corrective action and fined entertainers for not getting dressed and on the floor[13] quickly enough.    Named

---

[12] If an entertainer works two consecutive shifts, she is required to pay a second house fee if she wants to dance on stage. (**Ex. 3:** Adams Dep. at 58-59.)

Plaintiffs Monica Leaphart and Karenza Clincy were written up for this reason. (**Ex. 15:** Swinger Dep. at 45-47, Ex. 11 (explaining reason for fine and corrective action as ██████ and ██████); see also **Ex. 16:** Jordan Dep. at 95 (testifying to paying a fine for taking too long to get dressed).)

79.    Onyx management has discretion to restrict what entertainers are allowed to wear when performing at Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 79, 82 (testifying to telling entertainers that they were wearing inappropriate clothing, including clothing with political statements or drug paraphernalia); **Ex. 15:** Swinger Dep. at 50 (testifying that she would stop entertainers from going out on the floor if they were wearing sweatpants); see also **Ex. 3:** Adams Dep. at 63 (testifying that the house mom's job is to tell entertainers if they are wearing something inappropriate) and 61-63 (testifying that the standard applied at Onyx is two-piece costumes as opposed to gowns).)

80.    Onyx management has told entertainers to change their hairstyles and to wear makeup to cover scars and disfigurements. (**Ex. 13:** Hayes Dep. at 83; see also **Ex. 15:** Swinger Dep. at 52 (testifying to advising entertainers on their hair

---

[13] "The floor" is the main area of the club, which is open to patrons and from where table and stage dances can be observed. (Sales Dec. at ¶ 69; Clincy Dec. at ¶ 52; Parker Dec. at ¶ 65; Wells Dec. at ¶ 71; Jordan Dec. at ¶ 58; Leaphart Dec. at ¶ 72; Pough Dec. at ¶ 66.)

and makeup and being told by management to talk to entertainers about the same "to fix something that is wrong").)

81. Onyx does not approve of entertainers wearing their hair in ponytails. (**Ex. 5:** Wells Dep. at 68-69.)

82. Management has asked Named Plaintiff Jammie Parker to change her hair because it was "too big." (**Ex. 8:** Parker Dep. at 189-190.)

83. Entertainers are allowed to work with tattoos at the discretion of Onyx management. (**Ex. 13:** Hayes Dep. at 83.)

84. Additionally, Onyx management has instructed entertainers to lose weight, and has written up notices of corrective action for failure to do so. (**Ex. 13:** Hayes Dep. at 83, Ex. 27; <u>see also</u> **Ex. 15:** Swinger Dep. at 51 (testifying to talking to "overweight" entertainers and instructing them to "tone up").)

85. Management has also disciplined entertainers in other ways for not losing weight. For example, management told Named Plaintiff Jammie Parker that she could not dance on stage until she lost weight. (**Ex. 8:** Parker Dep. at 82; <u>see also</u> **Ex. 13:** Hayes Dep. Ex. 27.)

Undisputed Facts Related to Stage Rotation

86. Once entertainers have signed in with the house mom, paid their bar fees and gotten dressed, they go out on the main floor of the club to perform

personal dances for customers or dance on stage. (**Ex. 13:** Hayes Dep. at 47-48;

**Ex. 15:** Swinger Dep. at 73-75.)

87.    At 11:00 p.m., the stage rotation begins, and entertainers who arrive

after 11:00 p.m. are not guaranteed the opportunity to dance on stage. (**Ex. 13:**

Hayes Dep. at 47-48; **Ex. 15:** Swinger Dep. at 98, Ex. 22 p. NKA0003219.)

88.    The rotation (i.e., the order in which entertainers dance on stage) is

determined by the order in which entertainers signed in with the house mom when

arriving.  The DJ calls the entertainers to the stage in this order.[14] (**Ex. 3:** Adams

Dep. at 73.)[15]

89.    During the rotation, entertainers dance on stage in groups of as many

as five, depending on how many entertainers are working that night. (**Ex. 3:**

Adams Dep. at 74-75.)

90.    Entertainers are supposed to be on stage when their name is called by

the DJ. (**Ex. 3:** Adams Dep. at 9 (testifying that one of management's

responsibilities is to make sure entertainers are on stage when their names are

called).)

---

[14] The order of the stage rotation may be rearranged by the house mom. (**Ex. 6:**
Clincy Dep. at 91-92.)
[15] After entertainers have signed in, the house mom duplicates the sign-in sheet and
provides the DJ a copy. (**Ex. 3:** Adams Dep. at 92-93, Ex. 24.)  The list is posted
in the dressing room so that entertainers can see approximately when they will be
called to stage. (**Ex. 13:** Hayes Dep. at 91-92.)

91.    Plaintiffs Parker and Jordan, for example, have been fined for getting to the stage late. (**Ex. 8:** Parker Dep. at 100; **Ex. 16:** Jordan Dep. at 87.)

92.    Customers throw money on the stage during each dance, or hand money to the entertainers. (**Ex. 4:** Leaphart Dep. at 93-94; **Ex. 6:** Clincy Dep. at 55.)

93.    The general rule at Onyx is that entertainers on stage take their top off when they receive $10 and they take their bottoms off when they receive another $10. (**Ex. 13:** Hayes Dep. at 80.)

94.    The DJ generally announces for entertainers to remove all articles of clothing once $100 or more is thrown onto the stage for five entertainers. (**Ex. 13:** Hayes Dep. at 80 (explaining that "No customer wants to spend thousands of dollars not to see someone naked").)

95.    During the stage rotation, the DJ will often give instructions like "ladies remove your clothes," "go ahead and get naked," "tops" or "tops off," and "bottoms" or "bottoms off." (**Ex. 13:** Hayes Dep. at 81; see Pough Dec. at ¶ 31e; Sales Dec. at ¶ 35f; Jordan Dec. at ¶ 35e; Wells Dec. at ¶ 35f; Parker Dec. at ¶ 33f; Clincy Dec. at ¶ 31e; Leaphart Dec. at ¶ 36f ("I want to see elbows and assholes.") (quoting DJ).)

96.    Entertainers can be fined for not taking off clothes when told or not being fully naked on stage. (**Ex. 13:** Hayes Dep. at 80-82 (explaining such action as a "massive breach").)

97.    Entertainers are required to dance when they are on stage and have been fined for not doing so. (**Ex. 13:** Hayes Dep. at 49-50.)

98.    Onyx does not want their entertainers to two-step, which is considered "lazy" dancing and this and other expectations as to the manner of dance are conveyed by the DJ to entertainers. (**Ex. 13:** Hayes Dep. at 11; **Ex. 17:** Sales Dep. at 100; Jefferson Dec. at ¶ 52; Hughes Dec. at ¶ 52; Martin Dec. at ¶ 49; **Ex. 6:** Clincy Dep. at 94 (testifying to DJ instructing entertainers to bend over); Bloedoorn Dec. at ¶ 51 ("sometimes the DJ would instruct us to 'work harder' or tell us not to 'two-step,' which is a kind of dance.").)

99.    When customers throw money on the stage, Onyx's floormen gather it up and give the sum to the entertainers to divide later. (**Ex. 3:** Adams Dep. at 76.)

100.   Onyx's rule is that entertainers are supposed to split all tips received on stage evenly among the dancers who danced that stage set. (**Ex. 13:** Hayes Dep. at 58-59, **Ex. 15:** Swinger Dep. at 53 (testifying to help divide the tips evenly); **Ex. 3:** Adams Dep. at 75.)

101. Disputes about which or how much money belongs to which entertainer are investigated and handled by Onyx management. (**Ex. 13:** Hayes Dep. at 59.)

Undisputed Facts Related to Post-Shift Requirements and Mandatory Tip Requirements

102. Onyx imposes a check-out process on entertainers. Entertainers are required to check out before leaving, and may not simply leave at the end of the night. (**Ex. 3:** Adams Dep. at 79-80; **Ex. 15:** Swinger Dep. at 17.)

103. Although management has discretion to waive this rule, generally entertainers will be fined or otherwise disciplined for leaving early without approval from management. (**Ex. 3:** Adams Dep. at 20, 35; **Ex. 15:** Swinger Dep. at 16-17, 43-45, Ex. 10 (notice of corrective action for leaving without authorization); **Ex. 13:** Hayes Dep. at 27 (as to "early out fees"); **Ex. 2:** Williams Feb. 3 Dep. at 47; see e.g., **Ex. 5:** Wells Dep. at 76-77; **Ex. 8:** Parker Dep. at 144-146.)

104. At closing time, Onyx management, the floormen, and/or the DJ announce over the microphone that the club is closed and that patrons should exit. Entertainers are told to return to the dressing room. Floor staff escorts the customers out of the building. (**Ex. 3:** Adams Dep. at 79-80; **Ex. 13:** Hayes Dep. at 54-55; **Ex. 7:** Pough Dep. at 75 ("the DJ will say things like, you know, get your

A-S-S to the dressing room, get off the floor, move your A-S-S.  And he'll call out names, Little Sexy, get your A-S-S in the dressing room or whatever.").)

105.  After getting dressed, entertainers wait in line to complete the mandatory check-out process.  (**Ex. 16:** Jordan Dep. at 103-104; **Ex. 4:** Leaphart Dep. at 145-146.)

106.  Onyx requires that entertainers pay $0.50 for and pass a breathalyzer test prior to leaving.  The house mom and floor manager monitor this process. (**Ex. 13:** Hayes Dep. at 54, 76.)

107.  Onyx also requires that entertainers pay at least $7.00 to the house mom prior to leaving.  (**Ex. 3:** Adams Dep. at 80; **Ex. 15:** Swinger Dep. at 77; **Ex. 13:** Hayes Dep. at 73.)

108.  The house mom keeps the entire amount entertainers pay her.  (**Ex. 3:** Adams Dep. at 82.)

109.  Additionally, Onyx requires that entertainers pay the DJ the greater of 10% of the money the entertainers received from customers or $20.  (**Ex. 3:** Adams Dep. at 80; **Ex. 15:** Swinger Dep. at 77; **Ex. 13:** Hayes Dep. at 73.)

110.  These required payments were established by Onyx management, through Defendants Galardi and Kap, and not by the entertainers.  (**Ex. 15:** Swinger Dep. at 77; **Ex. 2:** Williams Feb. 3 Dep. at 42-43.)

111.   Onyx management has discretion to fine entertainers if management believes they have not paid the DJ the full 10% or $20.[16]  (**Ex. 15:** Swinger Dep. at 79; **Ex. 3:** Adams Dep. at 81; **Ex. 12:** Pony Tail Admission No. 4; see also Jefferson Dec. at ¶ 16 ("I usually tried to give the DJ at least $25 to attempt to avoid any trouble with management."); see e.g., **Ex. 6:** Clincy Dep. at 65-66; **Ex. 17:** Sales Dep. at 64-65; **Ex. 8:** Parker Dep. at 117-118; see also **Ex. 16:** Jordan Dep. at 118; Hughes Dec. at ¶ 20 ("Sometimes [during the check out process itself] the DJ would demand more money, threatening to 'fix' the stage rotation so that the entertainer would make less money on stage if she did not pay the DJ more.").)

112.   The DJ is required to give 40% of what he is paid by entertainers to management.  Half of that 40% is forwarded to the corporate office and the other half is split among Onyx management.  (**Ex. 3:** Adams Dep. at 81-82; **Ex. 13:** Hayes Dep. at 73-74.)

113.   The house mom, floor staff, and DJ all sign off on an "exit ticket" for each entertainer to show that she has paid all required fees and passed the breathalyzer test.  These tickets are kept in the management office at Onyx.  (**Ex. 13:** Hayes Dep. at 75-76.)

---

[16] Onyx does not count the number of dances that entertainers perform; though, floor staff monitors who appears to be generating money.  (**Ex. 13:** Hayes Dep. at 57-58.)

114.    Entertainers and the DJ also sign the DJ fee sheet, which shows how much the entertainer paid the DJ and the time she did so at the end of the night. (**Ex. 13:** Hayes Dep. at 92; **Ex. 2:** Williams Feb. 3 Dep. at 94-95, Ex. 24.)

115.    Entertainers are not allowed to exit the building following the check out process until the parking lot has been cleared of all customers. (**Ex. 3:** Adams Dep. at 79-80; **Ex. 13:** Hayes Dep. at 53-54, Ex. 13 (explaining Onyx's "policy").)

116.    After the parking lot is cleared, and provided they have paid and passed the breathalyzer test, entertainers are only allowed to exit the building in small groups. (**Ex. 13:** Hayes Dep. at 54.)

Undisputed Facts Related to Additional Rules

117.    Onyx has and generally distributes to entertainers upon hiring them, written rules of conduct.[17]  (See e.g., **Ex. 2:** Williams Feb. 3 Dep. at Ex. 9.)

118.    These rules were drafted by the corporate office, and are distributed to Defendant Galardi's various clubs for enforcement. (**Ex. 9:** Williams Feb. 10 Dep. at 17; **Ex. 13:** Hayes Dep. at 16.)

---

[17] Additionally, during some period of time since July of 2006, Onyx has had and distributed to entertainers an "exotic dancer manual," drafted by house mom Sabrina Swinger and based on the manual Onyx's waitresses follow. (**Ex. 13:** Hayes Dep. at 23, Ex. 10; **Ex. 3:** Adams Dep. at 90; **Ex. 15:** Swinger Dep. at 26-28.)

119. Not all of the rules are always enforced as written; however, management has discretion to enforce the rules as they see fit. (**Ex. 13:** Hayes Dep. at 25, 72; **Ex. 3:** Adams Dep. at 85-86; see also **Ex. 2:** Williams Feb. 3 Dep. at 49-50.)

120. Upon being hired by Onyx, entertainers are usually given and/or required to sign their assent to the rules of conduct. (**Ex. 2:** Williams Feb. 3 Dep. at 53, Ex. 9; **Ex. 15:** Swinger Dep. at 24-25; **Ex. 3:** Adams Dep. at 88-90.)[18]

121. After an entertainer has a successful audition (described below) and presents a permit to work from the City of Atlanta, Onyx usually gives the entertainer the rules of conduct described above. (**Ex. 13:** Hayes Dep. at 15-16.)

122. At that point, the house mom generally goes over the amounts entertainers are required to pay the DJ and house mom with the entertainer and walks through the club's general expectations. (**Ex. 15:** Swinger Dep. at 57, 70-71.)

123. Onyx has required that entertainers also attend meetings where management goes over Onyx's rules and policies and things like changes in city

---

[18] This paperwork, in addition to an information sheet with the entertainer's name and contact information and the entertainer's City of Atlanta permit to dance at Onyx, are stored in the management office at Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 41-42, 85; **Ex. 13:** Hayes Dep. at 14-16; **Ex. 3:** Adams Dep. at 85.) Onyx management checks the permits on file to make sure they have not expired. (**Ex. 3:** Adams Dep. at 21.)

laws, promotional events, and club décor.  (**Ex. 3:** Adams Dep. at 21-22; **Ex. 13:** Hayes Dep. at 67-68.)

124.   At one such meeting, entertainers were given a copy of the rules described above and asked to sign that they received the copy.  (**Ex. 15:** Swinger Dep. at 20-24, Ex. 4.)

Undisputed Examples of Additional Disciplinary Actions

125.   Another mandatory meeting was hosted by Defendant Kap at which Named Plaintiffs Kiesha Pough, Monica Leaphart, Naturee Wells, Summer Sales, Jammie Parker, and then-Plaintiff Jessica Appling were told that they could not return to work at Onyx unless they dismissed the instant suit.  (**Ex. 3:** Adams Dep. at 23; Leaphart Dec. at ¶¶ 63-70; Parker Dec. ¶¶ 57-63; Wells Dec. ¶¶ 62-69; Pough Dec. ¶¶ 58-64; Sales Dec. ¶¶ 59-67; Appling Dec. ¶¶ 54-61; **Ex. 18:** Aug. 11 Meeting Tr. at 14-15 (certified copy dated Aug. 13, 2009).)

126.   Onyx's General Manager Rick told the same to Named Plaintiff Karenza Clincy in a separate conversation.  (First Supp. Clincy Dec.; **Ex. 19:** Aug. 13 Meeting Tr. (certified copy dated August 14, 2009).)

127.   Prior to this meeting, Defendant Kap met with Onyx management and informed them that the Named Plaintiffs would be "indefinitely suspended" because of a "conflict of interest." (**Ex. 3:** Adams Dep. at 30.)

128.  Another form of discipline includes the corrective action notices discussed above.  (See e.g., **Ex. 15:** Swinger Dep. Exs. 2, 5-11 (bearing house mom and management signatures).)

129.  The written notices of corrective action, which are kept in the management office at Onyx, are a way of "keeping a log of what [entertainers] are not doing."  (**Ex. 15:** Swinger Dep. at 29, 35; **Ex. 13:** Hayes Dep. at 52.)

130.  Management has discretion to impose fees as part of corrective actions.  (**Ex. 15:** Swinger Dep. Ex. 11.)

131.  It is always up to Onyx management whether any corrective actions will be taken; though, they do sometimes consult with Defendant Kap and Defendant Galardi on this.  (**Ex. 2:** Williams Feb. 3 Dep. at 44-45.)

132.  For example, if house mom Sabrina Swinger notices an entertainer doing something that would warrant corrective action (i.e., a violation of Onyx rules), she lets management know, and management gives Ms. Swinger the form to complete.  (**Ex. 15:** Swinger Dep. at 30.)

133.  Additionally, if anyone in the club notices an entertainer doing something that warrants corrective action, they can bring the issue to the house mom's attention and a corrective action form may be completed.  In other words, the house mom need not have personal knowledge of each action to complete and

sign the corrective action form. (**Ex. 15:** Swinger Dep. at 41-42; see also **Ex. 2:** Williams Feb. 3 Dep. at 45-46 (testifying to staff responsibility to alert management if they see an entertainer providing "unsatisfactory performance," such as not dancing).)

134.   Onyx management is responsible for determining if an entertainer will be verbally counseled or warned and disciplined, counseled and/or warned entertainers for being insubordinate and using inappropriate language. (**Ex. 2:** Williams Feb. 3 Dep. at 37, 44; **Ex. 13:** Hayes Dep. at 51, 52; **Ex. 3:** Adams Dep. at 10.)

135.   Sometimes management consults with Defendant Kap about whether or how to discipline an entertainer. (**Ex. 13:** Hayes Dep. at 68.)

136.   In addition to corrective action forms, management has the authority to fine entertainers. (**Ex. 3:** Adams Dep. at 71; **Ex. 2:** Williams Feb. 3 Dep. at 37.)

137.   The house mom generally collects these fines the night they are imposed. (**Ex. 15:** Swinger Dep. at 115; **Ex. 3:** Adams Dep. at 71.)

138.   In addition to the fines discussed above and in the written rules of conduct, management can fine entertainers for bringing in outside food, breaking Onyx's rules and policies, breaking the law, or arguing or fighting with customers. (**Ex. 3:** Adams Dep. at 34; **Ex. 13:** Hayes Dep. at 48.)

139. Named Plaintiff Summer Sales was fined multiple times for not having a garter belt. (**Ex. 17:** Sales Dep. at 91.)

140. Entertainers can be fined for leaving the stage early. (**Ex. 8:** Parker Dep. at 76-77.)

141. Named Plaintiff Clincy has even been fined despite management not even being able to remember the reason for the fine at the time it was imposed. (**Ex. 6:** Clincy Dep. at 59.)

## UNDISPUTED FACTS RELATED TO OPPORTUNITY FOR PROFIT OR LOSS

142. The decision to have Onyx cater to the African American community, as opposed to a broader audience, was made by Defendants Galardi and Kap, Mr. Williams, and Onyx's general manager. (**Ex. 2:** Williams Feb. 3 Dep. at 59-60.)

143. Decisions about marketing and promotions for Onyx are made collectively with input from Mr. Williams, Defendant Kap, and GSE and GSEC's Director of Marketing, Jack Pepper. (**Ex. 2:** Williams Feb. 3 Dep. at 28.)

144. Defendant Pony Tail's corporate representative testified that Pony Tail pays all of the costs associated with advertising, marketing, and promoting for Club Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 16.)

145. Defendant Pony Tail contracts with other corporate entities to market Club Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 16.)

146.   Defendant Jack Galardi is the ultimate decisionmaker about the manner in which Onyx will be marketed and advertised. (**Ex. 2:** Williams Feb. 3 Dep. at 17.)

147.   The corporate office maintains the website www.showbars.com, which includes Onyx's website. (**Ex. 2:** Williams Feb. 3 Dep. at 27.)

148.   Mr. Pepper works on updating Onyx's website with information from Onyx management, as well as designing advertisements for Onyx.  (**Ex. 2:** Williams Feb. 3 Dep. at 27; **Ex. 11:** Pepper Dep. at 7.)

149.   Mr. Pepper takes direction from Defendants Kap and Galardi, Mr. Williams, and Onyx's managers, with the management team approving advertisements prior to circulation. (**Ex. 11:** Pepper Dep. at 16, 35.)

150.   Once an advertisement is designed, Onyx's managers usually have the responsibility of placing it in circulation. (**Ex. 11:** Pepper Dep. at 27.)

151.   Entertainers are not consulted regarding advertising and marketing for Onyx, including the design or content of Onyx's website. (Wells Dec. at ¶¶ 44-47; Pough Dec. at ¶¶ 40-43; Parker Dec. at ¶¶ 42-45; Leaphart Dec. at ¶¶ 45-48; Jordan Dec. at ¶¶ 44-47; Sales Dec. at ¶¶ 44-47; Clincy Dec. at ¶¶ 40-43; Jefferson Dec. at ¶ 46; Bloedoorn Dec at ¶ 45; Martin Dec. at ¶¶ 42-43; Appling Dec. at ¶¶ 40-43; Hughes Dec. at ¶ 46.)

152.   Onyx management made the decision to provide customers with free tableside dances from entertainers on the customer's birthday.  (**Ex. 2:** Williams Feb. 3 Dep. at 60-61.)

153.   Onyx management is responsible for making sure that the club has enough dollar bills or small currency for customers to purchase/exchange larger bills in order to "make it rain."[19]  (**Ex. 2:** Williams Feb. 3 Dep. at 60-61.)

154.   Onyx has run out of one dollar bills to give to customers before.  (**Ex. 13:** Hayes Dep. at 81; Sales Dec. at ¶ 37; Jordan Dec. at ¶ 37; Leaphart Dec. at ¶ 38; Parker Dec. at ¶ 35; Wells Dec. at ¶ 37; Pough Dec. at ¶ 33; Clincy Dec. at ¶ 33; Bloedoorn Dec. at ¶ 36; Martin Dec. at ¶ 34; Appling Dec. at ¶ 33; Hughes Dec. at ¶ 37.)

155.   There is an ATM inside Onyx and, when the ATM runs out of money, it is the responsibility of Onyx's managers to call the vendor to restock the machine.  (**Ex. 2:** Williams Feb. 3 Dep. at 61; **Ex. 3:** Adams Dep. at 65.)

156.   To enter Onyx, customers must pay a door fee of between $10 and $40.  (**Ex. 3:** Adams Dep. at 83.)

---

[19] This refers to the practice of customers throwing money up in the air for it to "rain" down on entertainers dancing on stage.  (**Ex. 3:** Adams Dep. at 52; **Ex. 2:** Williams Feb. 3 Dep. at 61.)

157.   Whether a customer is allowed inside Onyx is ultimately management's decision. (**Ex. 2:** Williams Feb. 3 Dep. at 62.)

158.   Floormen are responsible for dealing with customers who behave badly in the club and, together with management, make the ultimate decision about whether a customer will be asked to leave. (**Ex. 2:** Williams Feb. 3 Dep. at 62-63.)

159.   If a customer refuses to pay an entertainer, the entertainer is supposed to inform the floormen. Management then addresses the situation by making a decision as to whether there is truth to the claim, and only if they believe the entertainer will management pursue the customer. (**Ex. 3:** Adams Dep. at 65-66.)

160.   There is a two-drink minimum for customers at Onyx. (**Ex. 13:** Hayes Dep. at 75.)

161.   Stage sets are at specific times, not determined by entertainers, who may not be guaranteed a turn on stage if they arrive late or miss their name being called. (**Ex. 13:** Hayes Dep. at 24.)

162.   When there are disputes about the mandatory split of stage tips, management and/or the house mom resolve the disputes. (**Ex. 13:** Hayes Dep. at 58; **Ex. 3:** Adams Dep. at 75; **Ex. 15:** Swinger Dep. at 54.)

163.  Onyx's general manager has testified to terminating an entertainer because she was "a bad look for Club Onyx and made the other entertainers look bad." (**Ex. 13:** Hayes Dep. at 65.)

164.  Onyx controls: advertising and marketing, drink prices, dance prices, entertainer hiring, music selection, club layout, lighting, hiring of waitstaff, security and other employees who interact with customers, club hours, club amenities and cleanliness, food selection and pricing, cover charge and overall club atmosphere.  (Clincy Dec. at ¶ 32; Pough Dec. at ¶ 32; Wells Dec. at ¶ 36; Parker Dec. at ¶ 34; Leaphart Dec. at ¶ 37; Jordan Dec. at ¶ 36; Sales Dec. at ¶ 36; Bloedoorn Dec. at ¶ 35; Martin Dec. at ¶ 33; Appling Dec. at ¶ 32; Hughes Dec. at ¶ 36; Jefferson Dec. at ¶ 36.)

165.  Onyx allows "birthday sets" or "birthday parties" for entertainers, during which the entertainer whose birthday it is gets to perform on stage for a set of songs with the entertainers of her choosing.  The entertainer whose birthday it is typically dances more prominently than the other entertainers and, at the end of the stage set, she gets to keep all of the tips customers gave to or threw at the entertainers during the set. (Bloedoorn Dec. at ¶ 40; Hughes Dec. at ¶ 41.)

166.   In order to have a birthday set or birthday party, an entertainer needs to sign up in the management office at Onyx and, generally, can only sign up if no one else already has. (**Ex. 13:** Hayes Dep. at 94-95.)

167.   Although entertainers who have birthday parties can decorate the club with balloons and sometimes print advertisements for their birthday party, management makes the ultimate decision about whether an entertainer is even allowed to have a birthday party. (**Ex. 13:** Hayes Dep. at 94-95; **Ex. 6:** Clincy Dep. at 74-75; Bloedoorn Dec. at ¶ 40; Thorpe Dec. at ¶¶ 7-13 ("Entertainers who worked the day shift were not allowed to have birthday parties.").)

168.   For example, when opt-in Plaintiff Judith Bloedoorn asked the house mom if she could have a birthday party, the house mom said that she could not because she had not worked enough days at Onyx. (Bloedoorn Dec. ¶ 40.)

169.   When Named Plaintiff Kimberly Jordan asked the house mom if she could have a birthday party, the house mom told her she could not. (**Ex. 16:** Jordan Dep. at 107-108.)

170.   Onyx has denied entertainers' requests to promote the club by using the club's van or on the radio. (Thorpe Dec. at ¶¶ 14-15.)

## UNDISPUTED FACTS RELATED TO INVESTMENT IN THE BUSINESS AND CONTROL OF PREMISES

171. The Named Plaintiffs have not made any capital investment in the facilities, advertising, maintenance, sound system, lights, food, beverage, other inventory, or staffing efforts undertaken on behalf of Onyx and were not consulted regarding the same. (Sales Dec. at ¶ 46; Jordan Dec. at ¶ 46; Leaphart Dec. at ¶ 47; Parker Dec. at ¶ 44; Wells Dec. at ¶ 46; Pough Dec. at ¶ 42; Clincy Dec. at ¶ 42; see also Bloedoorn Dec. at ¶ 46; Martin Dec. at ¶ 44; Appling Dec. at ¶ 42; Hughes Dec. at ¶ 47; Jefferson Dec. at ¶ 47.)

172. Defendant Pony Tail has leased the premises where Onyx is located at all times since July of 2006. (**Ex. 12:** Pony Tail Admission No. 14.)

173. Defendant Pony Tail has admitted to owning and controlling Club Onyx. (**Ex. 12:** Pony Tail Interrog. Resp. No. 2.)

174. Defendant Pony Tail's corporate representative has testified that Pony Tail employs bartenders, waitresses, door people, floormen, management, and shooter girls to work at Club Onyx. (**Ex. 2:** Williams Feb. 3 Dep. at 8-9.)

175. Pony Tail uses an outside payroll company to do payroll for these employees. (**Ex. 2:** Williams Feb. 3 Dep. at 21-22.)

176. Onyx, not entertainers, provides the stage and poles on which entertainers dance. (**Ex. 2:** Williams Feb. 3 Dep. at 77.)

177.   In January of 2007, there was a severe fire at Onyx—the club sustained significant damage. (**Ex. 2:** Williams Feb. 3 Dep. at 73-74.)

178.   When the club was rebuilt, it was rebuilt with funds from an insurance company and Defendant Galardi.  Defendant Pony Tail's corporate representative has testified that Pony Tail was the holder of the policy, as was the building's landlord.  Defendant Galardi personally paid amounts necessary for rebuilding in excess of what was paid by insurance and the landlord.  (**Ex. 2:** Williams Feb. 3 Dep. at 74-75.)

179.   Onyx has a video surveillance system, which was installed by a professional company and which is maintained in the management office. (**Ex. 2:** Williams Feb. 3 Dep. at 64-66.)

180.   Onyx management is in charge of day-to-day purchasing (liquor, lightbulbs, etc.). (**Ex. 2:** Williams Feb. 3 Dep. at 25-26.)

181.   Many of the corporations falling under GSE and GSEC have joint purchasing power for things like advertising, linen, sanitations, phone, and utility services at the clubs. (**Ex. 2:** Williams Feb. 3 Dep. at 26-27.)

182.   Defendant Galardi owns several closely held corporations.  He uses money from those corporations for improvement or cash flow needs associated with Pony Tail if necessary. (**Ex. 2:** Williams Feb. 3 Dep. at 11.)

183.   Defendant Pony Tail uses an accountant to account for Onyx's money.   That accountant is likely paid under an arrangement with Defendant Galardi, but is not paid by entertainers.  (**Ex. 2:** Williams Feb. 3 Dep. at 12.)

184.   Defendant Pony Tail, Inc. produced to Plaintiffs its accounting ledger for years 2007, 2008, and 2009, excluding the following categories listed on the ledger   from   the   production: ████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████.

(<u>See generally</u> **Ex. 20:** Correspondence between Counsel dating from March 15, 2010 to May 6, 2010.)

185.   The partial accounting records produced show Defendant Pony Tail, Inc. to have incurred expenses ████████ in each 2007, 2008 and 2009 to operate Onyx.   These expenses include but are not limited to expenses for

████████████████████████████

██████████████████████████████████

██████████████████████████████████

(See generally **Ex. 21:** Defs.' Acct. Ledger.)

## FACTS RELATED TO DEGREE OF SKILL REQUIRED OF ENTERTAINERS

186.   There is no requirement that entertainers have past experience in order to work at Onyx.  (**Ex. 15:** Swinger Dep. at 57.)

187.   There is no requirement that entertainers have formal dance training in order to work at Onyx.  (**Ex. 13:** Hayes Dep. at 13; **Ex. 15:** Swinger Dep. at 57.)

188.   Onyx's manager, Cliff Adams, has never called and asked for references when he wants to hire an entertainer.  (**Ex. 3:** Adams Dep. at 97.)

189.   When an individual wants to work as an entertainer at Onyx, she comes to the club and is directed to the house mom.  (**Ex. 3:** Adams Dep. at 14-15; **Ex. 13:** Hayes Dep. at 8.)

190.   The house mom then speaks with the entertainer and does a "body check" to determine whether the entertainer's body is suitable for performing at Onyx.  The body check includes looking for stretch marks, obesity, bad tattoos, or other physical appearance factors that are not what Onyx is looking for in an entertainer.  (**Ex. 13:** Hayes Dep. at 9; **Ex. 3:** Adams Dep. at 16; **Ex. 15:** Swinger Dep. at 55-58.)

191.  The house mom Sabrina Swinger has turned away girls after body checks because, as one example, they just gave birth and might have stretch marks or discolored skin.  (**Ex. 15:** Swinger Dep. at 55-58.)

192.  After the body check, the entertainer usually auditions by dancing on stage to three to five songs for the house mom and management.  (**Ex. 3:** Adams Dep. at 14-15; **Ex. 13:** Hayes Dep. at 8; **Ex. 15:** Swinger Dep. at 56.)

193.  Not all entertainers have been required to audition to work at Onyx; however, they have had to undergo some kind of physical evaluation or "body check." (See e.g., **Ex. 6:** Clincy Dep. at 32; Bloedoorn Dec. at ¶ 7; Jefferson Dec. at ¶ 7.)

194.  During the audition, management evaluates how the entertainer moves on stage, if she has rhythm, how experienced she appears to be, whether she maintains eye contact, and "how well [she] capture[s] the crowd."  (**Ex. 3:** Adams Dep. at 15; **Ex. 13:** Hayes Dep. at 10.)

195.  Generally speaking, the criteria Onyx uses for hiring entertainers include appearance, ability to dance, communication skills, costumes, weight, hair, demeanor, nails, cleanliness, perceived sexiness, and comfort being naked.  (**Ex. 2:** Williams Feb. 3 Dep. at 34-36.)

42

196.   The Named Plaintiffs do not have or do not use formal dance training in their work as entertainers for Onyx. (Clincy Dec. at ¶ 44; Pough Dec. at ¶ 44; Wells Dec. at ¶ 48; Parker Dec. at ¶ 46;  Leaphart Dec. at ¶ 49; Jordan Dec. at ¶ 48; Sales Dec. at ¶ 48; **Ex. 16:** Jordan Dep. at 48 ("I mean, it's nothing really to it. You just have to be pretty."); see also Bloedoorn Dec. at ¶ 48; Martin Dec. at ¶ 46; Appling Dec. at ¶ 44; Hughes Dec. at ¶ 49; Jefferson Dec. at ¶ 49.)

## **FACTS RELATED TO PERMANENCY OF RELATIONSHIP**

197.   There have been entertainers at Onyx who have performed there for a period of one year or longer, inclusive of breaks.  (**Ex. 12:** Pony Tail Admission No. 35; see also **Ex. 15:** Swinger Dep. at 13-14 (testifying to getting to know entertainers well over the course of their work for Onyx).)

198.   Named Plaintiff Naturee Wells worked as an entertainer at Onyx from approximately July of 2007 to August of 2009. (Wells Dec. at ¶ 1; **Ex. 5:** Wells Dep. at 17.)

199.   Named Plaintiff Summer Sales worked as an entertainer at Onyx from approximately May of 2008 to August of 2009. (Sales Dec. at ¶ 1; **Ex. 17:** Sales Dep. at 27-28.)

43

200.   Named Plaintiff Karenza Clincy has worked as an entertainer at Onyx from approximately June of 2007 to fall of 2010.  (**Ex. 6:** Clincy Dep. at 20-29; **Ex. 22:** Correspondence from Counsel dated October 1, 2010.)

201.   Named Plaintiff Monica Leaphart has worked as an entertainer at Onyx from approximately June of 2008 to the present.  (**Ex. 4:** Leaphart Dep. at 23-24.)

202.   Named Plaintiff Kiesha Pough has worked as an entertainer at Onyx from approximately May of 2008 to the present. (Pough Dec. at ¶ 1; **Ex. 7:** Pough Dep. at 28-29.)

203.   Named Plaintiff Jammie Parker worked as an entertainer at Onyx from approximately the latter half of 2008 to August of 2009. (Parker Dec. at ¶ 1; **Ex. 8:** Parker Dep. 32- 36.)

204.   Plaintiff Kimberly Jordan worked as an entertainer at Onyx from approximately 2007 to 2009. (Jordan Dec. at ¶ 1; **Ex. 16:** Jordan Dep. at 31-32, 36.)

205.   Opt- in Plaintiff Judith Bloedoorn worked as an entertainer at Onyx from approximately October 2007 to July 2009.  (Bloedoorn Dec. at ¶ 1.)

206.   Opt-in Plaintiff Amber Jefferson worked as an entertainer at Onyx for approximately two years. (Jefferson Dec. at ¶ 1.)

207.   Opt-in Plaintiff British Martin worked as an entertainer at Onyx for approximately one year on two separate occasions.  (Martin Dec. at ¶ 1.)

208.   Opt-in Plaintiff Brykelas Thorpe worked as an entertainer at Onyx for approximately nine months.  (Thorpe Dec. at ¶ 1.)

209.   Opt-in Plaintiff Torey Hughes worked as an entertainer at Onyx for approximately one year.  (Hughes Dec. at ¶ 1.)

210.   Although the Named Plaintiffs may have taken breaks during their tenure at Onyx or worked for other clubs at the time they were working for Onyx, they considered Onyx their "home club," working a minimal amount, if any, at other clubs, and not working at other clubs during times they were scheduled to work at Onyx.  (Clincy Dec. at ¶ 29; Sales Dec. at ¶ 29; Jordan Dec. at ¶ 29; Leaphart Dec. at ¶ 30; Parker Dec. at ¶ 29; Wells Dec. at ¶ 29; Pough Dec. at ¶ 29; see also Bloedoorn Dec. at ¶ 30; Martin Dec. at ¶ 30; Appling Dec. at ¶ 29; Hughes Dec. at ¶ 29; Jefferson Dec. at ¶ 30; see e.g., **Ex. 6:** Clincy Dep. at 27-28 (testifying to quitting job at other club because she could not work there and maintain Onyx's schedule).)

211.   Onyx's general manager has fired entertainers for working at another club on days they were scheduled to work at Onyx. (**Ex. 13:** Hayes Dep. at 86.)

45

## FACTS RELATED TO HOW INTERGRAL ENTERTAINERS ARE TO THE BUSINESS

212.  It is well-known in and around Atlanta that Onyx is a strip club. (**Ex. 3:** Adams Dep. at 56.)

213.  Onyx is busy because of the entertainers. (**Ex. 3:** Adams Dep. at 60 ("Girls make the club busy.  As far as if you don't have enough girls in the building, your customers won't stay, you know.").)

214.  Onyx has one main dancing stage and two satellite stages. (**Ex. 3:** Adams Dep. at 73.)

215.  The main stage is visible from almost every location in the club, and, the areas where the main stage is not visible have their own smaller stages. (**Ex. 13:** Hayes Dep. at 69.)

216.  Photographs of the inside of Onyx show that poles and stages are central to the layout of the club. (Landis Aff. Ex. B p. NKA0005081-0005095.)

217.  Onyx's own website demonstrates that naked or scantily clad women are at the heart of the business. (Landis Aff. Ex. A; see also Landis Aff. Ex. B.)

218.  A search of publically available internet sites also shows that the theme of naked or scantily clad women is prevalent throughout online discussion of Onyx. (Landis Aff. Ex. C.)

219.   On nights that there are many customers and few entertainers at Onyx, management will call in additional entertainers who work for Onyx.  (**Ex. 15:** Swinger Dep. at 93.)

220.   One of the reasons for disciplining entertainers for spending too much time in the dressing room is that customers leave, depriving Onyx of business, if entertainers are not on the floor dancing.  (**Ex. 15:** Swinger Dep. at 21, 45-47 ("The club has rules to keep their business open"); **Ex. 15:** Swinger Dep. Ex. 11 (█████████████████████████████████████████ █████████████.).)

221.   In hiring management for Onyx, Defendant Pony Tail looks for someone with experience in the adult entertainment industry.  (**Ex. 2:** Williams Feb. 3 Dep. at 37.)

222.   Defendant Pony Tail's Fulton County application to register a business under a trade name states that the nature of the business is both adult entertainment and alcohol. (**Ex. 2:** Williams Feb. 3 Dep. at 94, Ex. 20.)

223.   Onyx has an adult entertainment license, which Defendant Pony Tail believes has "value." (**Ex. 2:** Williams Feb. 3 Dep. at 69-70.)

224.   Onyx has advertised in Xciement magazine, a magazine geared toward the adult entertainment industry. (**Ex. 11:** Pepper Dep. at 39.)

225. Mr. Pepper, who Defendant Galardi chose to do marketing work for his clubs, including Onyx, has spoken at the annual adult entertainment trade show sponsored yearly by Exotic Dancer Publications in Las Vegas. (**Ex. 11:** Pepper Dep. at 18-19.)

226. Mr. Pepper did design work for the Onyx billboard on Highway 85 in Atlanta and chose to put scantily clad women on it, conveying to the public that Onyx is an adult entertainment nightclub. (**Ex. 11:** Pepper Dep. at 26, 28.)

NICHOLS KASTER, PLLP

Date: October 14, 2010

s/ Anna P. Prakash
Donald H. Nichols (GA Bar No. 450212)
E. Michelle Drake (GA Bar No. 229202)
Steven Andrew Smith
    (MN Bar No. 260836)
    *Admitted Pro Hac Vice*
Anna P. Prakash (MN Bar No. 0351362)
    *Admitted Pro Hac Vice*
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 338-4878

CAMPANO & SPERLING
Jennifer K. Mason (GA Bar No. 42418)
3175 Shallowford Road
Chamblee, GA 30341
Work Phone (770) 458-4477
Fax (770) 458-7663

ATTORNEYS FOR PLAINTIFFS