# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

KARENZA CLINCY, et al.  )
                    )
    **Plaintiffs,**         )
                    )  **CIVIL ACTION FILE NO.**
**v.**                  )  **NO. 1:09-CV-2082-RWS**
                    )
**GALARDI SOUTH ENTERPRISES,**  )
**INC., d/b/a THE ONYX, et al.**    )
                    )
    **Defendants.**        )

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COME NOW Galardi South Enterprises, Inc., Galardi South Enterprising Consulting, Inc., Pony Tail, Inc., Mike Kap, and Jack Galardi, Defendants in the above-styled civil action, and pursuant to Fed. R. Civ. P. 56 and LR 56, file their Response Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment, as follows:

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The court should view the evidence

and any inferences that may be drawn in the light most favorable to the nonmovant. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden of showing the absence of a genuine issue of material fact falls squarely, and with great weight, upon the moving party." <u>Pitts v. Shell Oil Co.</u>, 463 F.2d 331, 335 (5th Cir. 1972)[1]. If the movant meets its burden, it then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmovant does so, summary judgment is inappropriate, and cannot be granted. <u>See</u> <u>id.</u>

---

[1] The decisions of the Fifth Circuit entered on or before September 30, 1981 are binding precedent on all federal courts in the Eleventh Circuit. <u>Bonner v. City of Pritchard</u>, 661 F.2d 1206 (11th Cir. 1981).

## ARGUMENT AND CITATION OF AUTHORITY

**A.  Plaintiffs do not satisfy essential conditions for FLSA "employee" status.**

A FLSA plaintiff carries the burden of proving all elements of her claim, including whether she is a putative "employee" within the meaning of the FLSA.  (See Memorandum of Law in Support of Defendants' Motion for Summary Judgment, ("DMSJ"), which is incorporated by reference herein.) Consistent with Congress' intent, if a plaintiff cannot establish putative "employee" status, the FLSA does not apply, and the Court may not subject the parties' business relationship to the "economic realities" test.  (Id. at 14-18).  As more fully explained in Defendants' Motion, compensation *by the putative employer* to the putative employee is an *essential* condition to an employer-employee relationship.  (Id. at 18, citing Graves v. Woman's Professional Rodeo Ass'n., 907 F.2d 71, 72-74 (8th Cir.1990)).   The undisputed facts[2] are that Club Onyx does not compensate Plaintiffs, and

_____

[2] See Defendants' Motion for Summary Judgment, which is incorporated herein by reference, for further analysis of the undisputed facts.   For purposes of responding to Plaintiff's Motion for Partial Summary Judgment, Defendants maintain that these facts are undisputed, or in the alternative, must be construed in the light most favorable to Defendants as nonmovants to Plaintiff's Motion.  See Adickes, 398 U.S. at 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142.

Plaintiffs have no expectation of any such compensation[3]. (DMSJ at 6-9, 15-16, 19-21). None of the cases Plaintiffs cite in their Motion absolve them of this burden, (see generally MPSJ, citing inter alia Reich v. Circle C., 998 F.2d 324 (5th Cir. 1993); Harrell v. Diamond A. Entertainment, 992 F. Supp. 1343 (M.D. Fla. 1997)), and Plaintiffs do not independently establish putative "employee" status in their Motion. (See generally MPSJ.)

Because "[c]ourts must [ ] 'give meaning to every word and clause in a statute,'" Louis-Charles v. Sun-Sentinel Co., 595 F. Supp. 2d 1304, 1309 (S.D. Fla. 2008)(FLSA case), and "must reject statutory interpretations that would render portions of a statute surplusage," Bhd. of Locomotive Engineers v. CSX, Transp., Inc., 522 F.3d 1190, 1195 (11th Cir. 2008) (internal citations omitted), Plaintiffs' failure to establish putative "employee" status mandates summary judgment in Defendants' favor. (See generally DMSJ.)   Without waiving this argument, Defendant shows herein

---

[3] Filed contemporaneously with this Brief, Defendants are filing, under seal, copies of *133* independent contractor agreements, (hereinafter "Independent Contractor Agreements"), signed by entertainers, who did so once they returned to Club Onyx with an adult entertainment license issued by the City of Atlanta. (Accord Sales Dep 93). These documents are Club Onyx's business records maintained in the ordinary course of its business. They are being filed under seal because they contain entertainers' full names, home addresses, and Social Security Numbers, which this Court's Local Rules prohibit being filed in the public record.

that there are numerous disputed material facts that would preclude summary judgment should the Court engage in economic realities analysis.

**B.    The economic realities show that Plaintiffs are independent contractors, not Club Onyx's employees.**

Should the Court find it necessary to engage the economic realities test, the facts of this case significantly distinguish it from Reich v. Circle C., 998 F.2d 324 (5th Cir. 1993), and Harrell v. Diamond A. Entertainment, 992 F. Supp. 1343 (M.D. Fla. 1997), and weigh far more heavily in favor of independent contractor status for Club Onyx's dancers.  Alternatively, at a minimum, the many disputed, material facts compel a finding that granting summary judgment to Plaintiffs on this issue as a matter of law would be inappropriate.

In applying the economic realities test, Courts instruct that "[t]he existence and degree of each factor is a question of fact, while the legal conclusion to be drawn from those facts -- whether workers are employees or independent contractors -- is a question of law." Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir.1996) (determination of employment status is question of law); Patel v. Wargo, 803 F.2d 632, 634 n. 1 (11th Cir.1986) (subsidiary findings are questions of fact).  Most importantly, "economic reality" "'does not depend on technical or isolated factors,' or on 'the form of the relationship,' but rather 'depends ... on the economic reality' and 'the

circumstances of the whole activity,' given 'the total work arrangement.' Hodgson v. Griffin & Brand of McAllen, Inc., 471 F.2d 235, 237-38 (5th Cir.1973)(internal citations omitted).  Of course, as the Court is well-aware, if the nonmovant on summary judgment establishes genuine issues of material fact that are in dispute as it relates to the various factors analyzed under the economic realities test, summary judgment on the classification issue would not be proper.

**1.    Plaintiffs control most meaningful aspects of their work; other aspects are governed by State law and municipal ordinance, not Club Onyx.**

"The reality of the employment relationship is the real touchstone for control." Martin v. Priba Corp. 3:91-CV-2786-G, 1992 WL 486911 (N.D. Tex. Nov. 6, 1992), citing Usery v. Pilgrim Equip. Corp., 527 F.2d 1308, 1312 (5th Cir. 1976).  "A dancer can only be considered an independent contractor if she 'exerts such a control over a meaningful part of the business that she stands as a separate economic entity.'" Id.  Plaintiffs admit that "a dancer's economic status is inextricably linked to those conditions over which *defendants* have *complete* control." (Plaintiffs' Motion for Partial Summary Judgment, "MPSJ," at 13, quoting id.)(emphasis added).   It follows that those conditions that a defendant does not completely control,

or which are controlled more meaningfully by other entities, cannot weigh in favor of establishing it as a plaintiff's employer.

The evidence in this case shows that Plaintiffs, not Club Onyx, control the most meaningful parts of their dancing careers: when and how they dance, for whom they perform, their appearance, their income, manner of dance, and when they come-and-go from the Club. The few conditions identified by Plaintiffs as beyond their control are also beyond Club Onyx's complete control, and are mandated not by the Club itself, but instead by State law and municipal ordinance. As shown herein, Club Onyx only controls *de minimis* aspects of the business relationship. A careful analysis of the nature and degree of control factors weigh in favor of independent contractor status. At a minimum, too many disputed issues of material fact exist for the Court to decide the classification issue as a matter of law.

### a.    State law and municipal ordinance control meaningful conditions of Plaintiffs' work, not Club Onyx.

Club Onyx has no greater control over most aspects of how a dancer behaves at Club Onyx than Plaintiffs themselves. State law and City ordinance *dictate* most of the limitations Plaintiffs attribute to Club Onyx. This is a material economic reality. C.f. Circle C., 998 F.2d at 327.[4]

---

[4]   Circle C. does not, as Plaintiffs contend, summarily disregard that Club Onyx is required to implement certain rules and policies in nature of control

It would be manifestly unjust for the Court to close its eyes and ignore that Club Onyx is a business subject to significant State and municipal laws and regulations, and argue that complying with applicable law *ipso facto* makes Club Onyx Plaintiffs' employer, while Plaintiffs obfuscate the real facts which show how independently each Plaintiff actually operates from Club Onyx. Id.

The Court can take judicial notice that there are certain aspects of operating Club Onyx which the State and City of Atlanta, and not Club Onyx, control, namely: a) what types of activities can and cannot occur in the Club[5], b) which permits and licenses dancers and club owners must have

---

analysis. The Circle C. court actually considered this evidence in its analysis, but found that enforcement of other rules which were not targeted at legal compliance, together with other control factors which are not present in this case, supported a finding that Circle C. controlled its dancers. Case law, which suggests otherwise, incompletely truncates the Circle C. court's analysis, and is itself "unavailing." E.g., Morse v. Mer Corp., 1:08-CV-1389-WTL-JMS, 2010 WL 2346334 (S.D. Ind. June 4, 2010), citing Circle C., 998 F.2d at 327.

[5] CODE OF THE ORDINANCES OF THE CITY OF ATLANTA ("C.O.C.A.") § 10-228

> (a) For the purposes of this section, the term "alcoholic commercial establishment" means any hotel, motel, restaurant, park, nightclub, lounge, bar or private club where alcoholic beverages are dispensed or consumed, but the definition excludes any theater which sells alcoholic beverages pursuant to sections 10-58 and 10-214 or any auditorium as defined in section 10-1.

in order to engage in permitted activities[6], and c) what hours the Club can legally be open for business.[7]   The Court can also take judicial notice that

---

(b) It shall be unlawful for *any person to commit* the following acts in any alcoholic commercial establishment or for any licensee to knowingly permit *or allow such acts to be performed*:

(1) For any person to touch, caress or fondle an entertainer or dancer, except to place money in garters worn for such purposes.

(2) For any dancer in such establishment to leave the premises and return during the same shift, without signing out on a log provided by the employer stating the dancer's name, destination and expected time of return.

(3) For any dancer to, by bending, stooping and other postural movements, display the interior of the dancer's anus or vagina.

(c) The owner or manager of such adult commercial entertainment establishment shall submit to the licensing division of the department of police a copy of its rules and regulations for the conduct of its patrons and employees.

(d) Failure to comply with this section shall be considered as due cause to suspend, revoke or refuse to renew any license issued by the city pursuant to this article.

(emphasis added), a copy of relevant C.O.C.A. provisions are attached hereto as Exhibit "1," and expressly incorporated by reference; see also O.C.G.A. § 3-3-40, et. seq. (detailing prohibited sexual conduct on premises that serve alcohol by dancers and premises owners).

---

[6] C.O.C.A. § 10-206(a)

*Required.* No person shall perform job duties/functions of any type either directly as an employee or agent, or indirectly, as an *independent contractor* or other person, at an adult entertainment establishment, as defined in section 16-29.001(3)(e) and which is licensed for the sale of alcoholic beverages for consumption on the premises or the operation of a bottle house, until such person has been fingerprinted by the department of police and has been issued a permit by the department of police indicating such person is eligible to perform job duties /functions at the particular establishment at issue.

the City requires Club Onyx to submit a security plan for municipal review before it grants (or renews) a liquor license to sell alcoholic beverages, and that the Club is required to adhere to the approved plan in order to remain eligible for renewal.[8]

Finally, the Court can also take judicial notice that the Georgia Dram Shop Act imposes a duty on Club Onyx to reasonably monitor its independent contractors – who are allowed to drink on the premises – to ensure that they do not drive themselves home from the Club while intoxicated.[9]

---

This shall include all employees, ***independent contractors***, agents, managers and performers and entertainers and any other persons who desire to perform and/or perform job duties /functions at an adult entertainment establishment licensed for the sale of alcoholic beverages for consumption on the premises or operating as a bottle house. An application fee of $50.00 is due at the time of application.

(emphasis added).

[7] See C.O.C.A. § 10-209 (detailing with great specificity the hours an alcoholic commercial establishment can serve certain types of alcohol, how long after discontinuance of alcohol sales such an establishment must be cleared of patrons, and how long after clearance the establishment must remain closed before reopening).

[8] C.O.C.A. § 10-48(a), (b)(16), (i) (requiring that an applicant for an alcoholic beverages license comply with section 10-48 provisions, including provision of a security plan for the City's review).

[9] C.f. O.C.G.A. § 51-1-40(d) (a premises licensed for the sale of alcoholic beverages may in certain circumstances be liable to a person who suffers

Reviewing the indicia of "control" cited by Plaintiffs with these statutory requirements in mind reveals that Plaintiffs enjoy a far greater degree of control over their dance-related conduct than does Club Onyx.

**b.    Plaintiffs are not required to adhere to written rules of conduct, and Club Onyx does not enforce its advisory rules by disciplining its dancers.**

Unlike in Circle C. and Harrell, Plaintiffs here are not required to adhere to "written rules of conduct" as a pre-condition to dancing at Club Onyx. (Wilson Dep. 86 (rules in employee handbook not enforced); Jordan Dep. 122-124 (rules not enforced, she has done or seen "everything" broken on the list), Swinger Dep. 20:21-22; see also Affidavits of Fe Simien-Hicks, Ashley Seals, Keyarra Johnson, Alice Taylor, Tammy McAdoo, Lauren Smith, Chidinma Obioma, Shamariah Blair, Janell Hall, Daphne Reed, Chanel Adrienne Meadows, Latanjula Thomas, Ronnie Barfield, Rachel Hardeman, Alexzia Gonzalez, & Karen Robinson, (hereinafter, collectively "Dancer Affidavits"), each at ¶6, and Independent Contractor Agreements[10]

---

injury or death caused by the intoxication of a person who consumes alcohol on the premises); Baxley v. Hakiel Industries, Inc., 280 Ga. App. 94, 96, 633 S.E.2d 360, 362 (Ga. Ct. App. 2006), vacated on other grounds by 287 Ga. App. 259, 651 S.E.2d 366 (Ga. Ct. App. 2007)(an alcohol provider has the duty to exercise reasonable care to determine whether a recipient of alcohol is noticeably intoxicated and if she would be driving soon).

[10] Filed contemporaneously with this Brief, Defendants are filing, under seal, copies of *133* independent contractor agreements, (hereinafter "Independent

at ¶III, <u>contra</u> Plaintiffs' Statements of Material Facts, "PSMF," ¶¶117-122[11]; <u>c.f.</u> <u>Circle C</u>, 998 F.2d at 327; <u>Harrell</u>, 992 F.Supp. at 1349-50.)  Nor are they required to follow any such rules.  (<u>See</u> <u>id.</u>, <u>and</u> Hayes Dep. 24-26, Adams Decl. ¶¶5(c)-(d) & Dancer Affidavits, at ¶7(c), <u>contra</u> PSMF ¶¶50, 57; <u>and</u> Adams Dep. 86, 92, Hayes Dep. 24-26, & Swinger Dep. 46, <u>contra</u> PSMF ¶55; <u>and</u> Swinger Dep., Exh. 11, <u>contra</u> PSMF ¶78; <u>and</u> Dancer Affidavits, at ¶7(m), <u>contra</u> PSMF ¶97; <u>and</u> Hayes Dep. 26, <u>contra</u> PSMF ¶103; <u>see also infra</u> n. 12, <u>contra</u> PSMF ¶¶58, 96, 97, & 103.)

Club Onyx does provide its entertainers with hortatory rules of conduct designed to encourage a professional, legally compliant environment. (PSMF ¶¶136-140).  But, the "presence of such written rules," itself does not weigh in favor of employee status; it actually bears no

---

Contractor Agreements"), signed by entertainers, who did so once they returned to Club Onyx with an adult entertainment license issued by the City of Atlanta.  (<u>Accord</u> Sales Dep 93).  These documents are Club Onyx's business records maintained in the ordinary course of its business.  They are being filed under seal because they contain entertainers' full names, home addresses, and Social Security Numbers, which Local Rules prohibit being filed in the public record.

[11] A considerable number of Plaintiffs' Statements of Material Fact are unsupported by the facts they cite in support; most have inaccurately re-stated or mischaracterized witness testimony.  (<u>See</u> Defendant's Response to Plaintiff's Statement of Undisputed Facts at Part I, ¶¶4-5.)  Defendants refer the Court to the numerous objections raised in their Response to PSMF, which they incorporate by reference into this Response Brief, and will highlight here only those facts which are necessary to rebut Plaintiffs' Motion.

significance at all.  It matters only how the parties actually, in fact, acted with respect to these rules.  See Usery, 527 F.2d 1308 ("It is not significant [for FLSA purposes] how one *could have acted* under the contract terms. The controlling economic realities are reflected by the way one *actually acts*.")(emphasis added).

Club Onyx does not enforce any rules except only those which bear directly on the dancers' safety and compliance with the law.  See supra Part B.1.a., and infra Parts B.1.c & B.1.f, c.f. (PSMJ ¶134).  The parties' actions in this regard weigh heavily against employee status.  Usery, 527 F.2d at 1308; c.f. supra Circle C., 998 F.2d at 327.

### c.    Plaintiffs control when and how they work.

Facts surrounding Plaintiffs' work schedules also weigh heavily against classifying them as employees.  The cases Plaintiffs rely upon in support of "control" by Club Onyx do not apply here.  For instance, in Jeffcoat v. State of Alaska, Dep't of Labor, the dancers there were required by contract to work assigned eight hour shifts six days a week for a six week period.  732 P.2d 1073, 1074-75 (Alaska 1987).  After required clock-in, Jeffcoat dancers were required to dance three dances: the first two largely clothed, and the third topless, each lasting from nine to fifteen minutes.  Id. at 1075.  Dancers were encouraged to have customers buy them drinks.

Management accounted for the drinks each dancer successfully solicited; each drink gauged her popularity, information which the <u>Jeffcoat</u> used to assign future shifts. <u>Id.</u>

While Club Onyx has "day," "mid," and "night shifts," the Club does not decide when entertainers must appear or report to perform. (Hayes Dep. 40). More importantly, the Club does not limit entertainers to performing only those shifts for which they sign up to perform. <u>Compare</u> Independent Contractor Agreements at ¶IV; Hayes Dep. 40; Adams Decl. ¶5(c)-(d) & Dancer Affidavits, at ¶7(d), <u>but see</u> PSMF ¶¶48, 49), <u>with</u> <u>Jeffcoat</u>, 732 P.2d at 1074-76. Plaintiffs' own testimony is that they choose when they perform, (Leaphart Dep. 63), notify the Club of those days they want to perform, (<u>id.</u> at 70-71), arrive whenever they please to perform on any given night, (Wilson Dep. 29), and are allowed to perform at the Club even after failing to call or show on days they previously scheduled themselves to dance. (<u>Id.</u> at 31). These facts demonstrate that Plaintiffs have virtual *carte blanche* to come and go as they please, and to behave as they wish while in the Club. <u>See also</u> Independent Contractor Agreements, at ¶IV.

Club Onyx is an alcoholic commercial establishment, whose primary stream of revenue comes from alcohol sales. (Williams Dep. 67 (Feb. 3, 2010).) Compliance with State law and City ordinances is essential to its

business.  Id.; see also Independent Contractor Agreements, at ¶VII. Because City ordinances regulate when such establishments can be open for business, and for how long they must be closed before reopening, the Club cannot be open twenty-four (24) hours a day.  See supra n. 8, citing C.O.C.A. §10-209.  Defendant Pony Tail, Inc., which operates Club Onyx, establishes the Club's operating hours consistent with the City's ordinances. (Defendants' Resp. to Plaintiffs' Statements of Material Facts, "DRSMF," ¶47).  These are the only limitations to Plaintiffs' access to the Club.

Club Onyx does not prohibit dancers from drinking while at the club or even while performing.  (Leaphart Dep. 117; Wilson Dep. 37).  However, unlike in Jeffcoat, Club Onyx does not encourage dancers to solicit drinks from customers, and does not keep tabs of any drinks bought by customers for a dancer or factor such in determining a dancer's shift.

Also unlike Jeffcoat, Club Onyx dancers decide what shifts to dance, when during their shifts they dance, where to dance, for whom they dance, and how long they wish to dance for any given patron.  Dancers can ignore a call from the DJ to perform on stage if she is already performing a table-side dance for a customer, or prefers not to do so.  Compare Leaphart Dep. 152-153, with Jeffcoat, 732 P.2d at 1076.  A Club Onyx dancer can spend as much time with a customer as she wants, and has the choice of customers for

whom she performs.  (Williams Dep. 47; Clincy Dep. 95; Wells Dep. 47, 71; Sales Dep. 69-70; Leaphart Dep. 157; Pough Dep. 65; Cliff Adams Decl., ¶5).  Club Onyx dancers take breaks from performing whenever they want. (Williams Dep. 47).  When business is slow, some dancers even sit around the Club and read.  (Sales Dep. 75-76).  This is plainly unlike the facts in Jeffcoat; in fact, a comparison of these facts to those in Jeffcoat weigh strongly against employee status.

The facts here are also very different from those present in Circle C. No Club Onyx dancer is "*required* to comply with weekly work schedules." See Independent Contractor Agreements, at ¶IV, contra Circle C., 998 F.2d at 327.   Dancers perform at Club Onyx when they want to perform, regardless of whether they are, in fact, scheduled to perform.  (Hayes Dep. 40).  In stark contrast to Club Onyx's bar and wait staff employees who must report by and work for set times, dancers set their own schedules, select which days and nights they want to work, and ultimately decide when they arrive and leave Club Onyx or if they will work at all.  (Williams Dep. 47; Hayes Dep. 40; Adams Dep. 36; Clincy Dep. 44-45, 48-49; Wells Dep. 29-32, 34; Sales Dep. 43-44; Jordan Dep. 58, 133; Leaphart Dep. 50, 63;  Pough Dep. 47, 50, 96-97; Cliff Adams Decl., ¶5; Dancer Affidavits, at ¶¶7(c), (e)). Dancers are free to take off weeks, or sometimes even months at a time from

performing at Club Onyx, and are permitted to return and perform without penalty or consequence. (Clincy Dep. 28-29, 47-48; Wells Dep. 72; Jordan Dep. 54-55; Leaphart Dep. 70, 75-76; Pough Dep. 98; Sales Dep. 22-24; Dancer Affidavits, at ¶7(e)). The restrictive rules which favored employee status in <u>Circle C.</u> (e.g., "no flat heels, no more than 15 minutes at one time in the dressing room, only one dancer in the restroom at a time, and all dancers must be 'on the floor' at opening time," 998 F.2d at 327), simply do not exist at Club Onyx. (<u>See</u> DRSMF at ¶¶77-79, Adams Dep. 13:7-8, 61:17– 64; Adams Decl., ¶5(a), Dancer Affidavits, at ¶7(a), & <u>supra</u> n. 12 , <u>contra</u> PSMF at ¶77-79.) Again, it is the parties' actions which determine the economic realities. <u>Usery</u>, 527 F.2d 1308 ("The controlling economic realities are reflected by the way one actually acts.").

**d.    Club Onyx does not control dancers' appearances.**

Unlike the facts in <u>Circle C.</u>, Club Onyx does not regulate dancers' appearances. (Wilson Dep. 70;15-22). Club Onyx does not restrict what entertainers are allowed to wear on the floor, (<u>supra</u> DRSMF at ¶¶77-79, Adams Dep. 13, 61-64; Adams Decl., ¶5(a), Dancer Affidavits, at ¶7(a), & <u>supra</u> n. 12, <u>contra</u> PSMF at ¶77-79), or dictate hair and makeup styles. (Swinger Dep. 52-53, Leaphart Dep. 81, Adams Decl., ¶5(a), <u>and</u> Dancer Affidavits, at ¶7(b), & <u>supra</u> n. 12, <u>contra</u> PSMF at ¶¶80-82). Also contrary

17

to Plaintiffs' assertions, Club Onyx dancers are free to display tattoos. (Swinger Dep. 53, <u>contra</u> PSMF at ¶83).  Club Onyx also does not monitor dancers' weight, set a desired weight, or discipline entertainers for not maintaining a certain weight.  (<u>See</u> Swinger Dep. 51, 115:19, <u>contra</u> PSMF at ¶¶84-85).  The only on-stage restrictions are to comply with City of Atlanta regulations. (Wilson Dep. 70:15-22).  That Club Onyx does not control dancers' appearance clearly supports a finding of independent contractor status.  (<u>See</u> PSMF at 11).

> **e.    Dancers are free to dance as they wish, for whom they wish, and for whatever fees they can negotiate.**
>
>> **i.    Atlanta industry standards suggest table-side dance fees; Plaintiffs engage in dance fee transactions completely independent of Club Onyx.**

As it relates to the fees dancers charge patrons for table-side dances, the Club and dancers alike are well-aware that the industry standard rate in the Atlanta market for a table-side dance is $10.00.  (Williams Dep. 60 (Feb. 3, 2010)).  That said, the Club does not negotiate or collect fees charged by its dancers to patrons for private dances, and Plaintiffs do not account for them to the Club.[12]  Therefore, the Club has no direct knowledge of what, if

---

[12] Mr. Hayes's cited testimony, (<u>see</u> PSMF at ¶¶93, 94), concerns stage-dance tips (<u>contra</u> MPSJ at 11), and has nothing to do with club-established pricing for personal dances at issue in <u>Harrell</u> or <u>Circle C</u>.  <u>See Harrell</u>, 992 F. Supp at 1349 ("***The club*** established a set fee for table dances")(emphasis

any money, a dancer actually charges or collects from a patron for each table-side dance. (Leaphart Dep. 92-93; Wells Dep. 47; Pough Dep. 71-72; Cliff Adams Decl., ¶5, contra PSMF at ¶5).   Plaintiffs engage in these transactions with the Club's patrons independently of Club Onyx.  (E.g., Wells Dep. 51-52 (discussion a negotiation for VIP dance fee between herself and a patron).)  Despite the presumptively set nature of table dance fees, this is not determinative of the independent contractor relationship. Plaintiffs here remain more independent in their ability to negotiate dance fees than the Express drivers, whose delivery prices were fixed by the company.  Compare id., with Express, 161 F.3d at 304. The balance of the factors here, as in Express, favor independent contractor status.  Id.

### ii.   Club Onyx does not require dancers to perform on stage, to follow DJ instructions.

Club Onyx does not require dancers to perform on stage.  See supra Part B.1.c.   Dancers choose to perform when and how they want; some choose not to perform without penalty or fine.  Id.   While on stage, the DJ, as part of his own job duties, naturally encourages the dancers to dance and the Club's patrons to tip them.  (PSMF at ¶¶93-95).  Dancers are not required to dance according to the DJ's directions in any particular manner,

---

added); Circle C., 998 F.2d at 327 ("*Circle C.* instructs the dancers to charge at least $10 for table dances and $20 for couch dances.").

and they are not fined or disciplined for dancing as they please.  (Dancer Affidavits, at ¶7(m) & supra n. 12, contra PSMF at ¶96-98).  These facts weigh strongly against employee status.  C.f. MPSJ at 11.

**f.      Club check-out procedures are designed to comply with the law and for the dancers' safety.**

Contrary to Plaintiffs' suggestion, Club Onyx does not control dancers' comings-and-goings.  (Wilson Dep. 29:6-12.)  Requiring dancers to subject themselves to a breathalyzer test, and to check-out before leaving the Club simply ensures compliance with State law and City ordinance, and the dancers' own safety, nothing more.

City ordinance requires dancers in an alcoholic commercial establishment like Club Onyx to provide various information in writing upon leaving.  C.O.C.A. § 10-228(b)(2).  Dram Shop Act provisions impose significant potential liability on the Club for torts caused by impaired persons who work there, and impose duties on the Club to monitor whether its employees and contractors are impaired beyond the ability to properly drive or otherwise harm others.  Compare id. & supra O.C.G.A. § 51-1-40(d), Baxley v. Hakiel Industries, Inc., 280 Ga. App. 94, 96, 633 S.E.2d 360, 362 (Ga. Ct. App. 2006), vacated on other grounds by Baxley v. Hakiel Industries, Inc., 287 Ga. App. 259, 651 S.E.2d 366 (Ga. Ct. App. 2007), with (PSMJ at ¶¶102, 106).  To the extent Club Onyx asks dancers to wait for

patrons to clear the parking lot and provides escorts to the dancers' vehicles, Plaintiffs clearly understand that this is done for their own safety, not to detain or unduly control them, and it is certainly more for their benefit, than for the Club's benefit.  (Wells Dep. 86).

Plaintiffs misread <u>Johnson v. Unified Gov't of Wyandotte Co.</u>, 371 F.3d 723, 729 (10th Cir. 2004) to suggest otherwise.   <u>Johnson</u> actually supports Defendants' argument that Club Onyx does not exercise substantial control over Plaintiffs because it does not control their comings-and-goings. In <u>Johnson</u>, the Tenth Circuit found that the Housing Authority defendant ***did not*** exercise substantial control over its security guards because: 1) they could come and go as they pleased within their agreed-upon shift; 2) starting times were flexible, depending on individual guards' needs; 3) guards could go home after working "only two hours;" and 4) they did not need permission to go on breaks.  371 F.3d at 729.

Here, as in <u>Johnson</u>, Plaintiffs decide when they arrive and leave the Club, not Club Onyx.  <u>Compare</u> Williams Dep. 47; Adams Dep. 36; Clincy Dep. 44-45, 48-49; Wells Dep. 29-32, 34; Sales Dep. 43-44; Jordan Dep. 58, 133; Leaphart Dep. 50, 63, 156; Pough Dep. 47, 50, 96-97; Cliff Adams Decl., ¶5, <u>with</u> <u>id.</u>  Even more so than in <u>Johnson</u>, Plaintiffs are not limited to working (or leaving the Club) during their agreed-upon shifts, <u>see supra</u>

Part B.1.c., and they do not have to remain at the Club for any set period of time before leaving.  See id.  Plaintiffs take breaks in between performance whenever and as often as they want.  Id.

That Club Onyx's check-out procedures are narrowly tailored and implemented to comply with the law and provide for dancers' safety, and do not in any way inhibit Plaintiffs' freedom to come and go from the Club as they please, weighs against the type of control needed to classify them as employees.

**2.    Club Onyx does not profit from Plaintiffs' dancing; each Plaintiff controls her own opportunity for profit and loss.**

The opportunity for profit and loss factor of the economic realities test asks whether "through their own initiative or managerial skill, [Plaintiffs] had the opportunity of realizing profit."  Aimable v. Long & Scott Farms, 20 F.3d 434, 443 (11th Cir. 1994); Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 304 (5th Cir. 1998).  The Express trial court found this factor to point toward a delivery driver's independent contractor status when evidence showed that although the company controlled customer volume and delivery prices charged to customers, each driver had the ability to choose how much he worked and experienced drivers knew which jobs were the most profitable.  161 F.3d at 304.

**a.     Plaintiffs each have the opportunity to profit well from their exotic dancing business.**

As in Express, each Plaintiff here has the ability to choose how often and for how long she works, and can choose to work on what she believes to be the Club's most profitable days and times.  Compare infra Part B.1.c, with id.  Even better than in Express, Plaintiffs determine their profit from table-side and VIP room dances without any involvement at all from Club Onyx.  Compare Wilson Dep. 55, with 161 F.3d at 304.

Plaintiffs here, unlike in Express, can take further initiative to market and promote themselves, (Hayes Dep. 94; Leaphart Dep. 106), and are not limited to performing at Club Onyx.  Compare Pough Dep. 122 (plaintiff dances outside the Club at private parties), with 161 F.3d at 304 (drivers only allowed to work for Express).  In fact, dancers are free to market themselves as they see fit, and often market and promote their own performances, including using social media networks, like Twitter® to increase the number of patrons who come to see them perform.  (Leaphart Dep. 103-106; Hayes Dep. 94; Wilson Dep. 73; Pough Dep. 101).  Another way dancers market and promote themselves is to request a "birthday set," whereby a dancer performs on stage at the Club with a group of other dancers, but keeps all the tip money herself, which can be substantial. (Hayes Dep. 94; Wells Dep. 73; Leaphart Dep. 101-105; Pough Dep. 89).

For these birthday sets, dancers are free to decorate the club as they wish; many also send out flyers promoting their event. (Wilson Dep. 73).

Plaintiffs' opportunities are not, as they assert, limited solely to their own "hustling" efforts. Theirs are directly related to advertising, marketing, and promotion over which they have considerable control. C.f. Harrell, 992 F. Supp. at 1352-53, citing Circle C., 998 F.2d at 328; Reich v. Priba, 890 F. Supp. 586, 593 (N.D. Tex. 1995). ████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ That Club Onyx controls its location, decor, and food and beverage prices, itself does not weigh in Plaintiffs' favor on this factor. Compare Express, 161 F.3d at 304, with Circle C., 998 F.2d at 328.

Each Plaintiffs' opportunities for profit remains. Dancers frequently leave Club Onyx with a "trash bag full of money." (Hayes Dep. 60; Adams Dep. 76; Swinger Dep. 14, 76). The district court in Express "clearly did not err" on fewer facts suggesting independent contractorship; neither would this Court. Express, 161 F.3d at 304. This factor weighs against employee status. Id.

### b.    Plaintiffs also have the opportunity to suffer losses.

Plaintiffs also have opportunity for financial loss because of degree of investment they make, (see infra Part B.3), and the nature of the exotic dancing business. Because patrons ultimately determine what, if any money a dancer makes on a given night, (Leaphart Dep. 127; Pough Dep. 64), there are nights when dancers earn *nothing*, or pay more to the Club in house fees than they earn from patrons, suffering an effective net loss for the shift. (Clincy Dep. 78-79, 112; Parker Dep. 57, 82, 119; Wells Dep. 42; Sales Dep. 55; Jordan Dep. 98-99; Leaphart Dep. 140; Pough Dep. 68). This admission on the part of the dancers constitutes the very antithesis of an employer-employee relationship – employees go to work to earn money, not to lose money. Yet, dancers claim on some nights, business is so slow at Club Onyx that they suffer financial losses by paying the Club more in house fees, which cover only DJ, security, and assistance expenses related to the plaintiffs' performance, (Leaphart dep. 117, 152), than they earn from tips and table-side dances. This voluntary financial arrangement between Plaintiffs and Club Onyx simply cannot meet any definition of the term "employer/employee relationship."

**3.     Plaintiffs invest considerably more in their exotic dancing than does Club Onyx.**

Plaintiffs would have the Court believe that Club Onyx invests significant sums of money to support or facilitate Plaintiffs' exotic dancing, when it does not.  (Contra PSMF at ¶¶184-185).  As Plaintiffs note, the Club's only direct investment in their exotic dancing work are the stage and poles on which they dance.  (See PSMF ¶¶172, 176).  The remaining investments, for facilities, maintenance, repairs, liquor licenses, and food would exist whether or not Plaintiffs performed at Club Onyx.  These investments are wholly independent of, and are in no way influenced or funded by, Plaintiffs' dancing, and should not be considered in the Court's analysis of the parties' relative degree of investment.

On the other hand, Plaintiffs invest significant sums of their own money in their dancing careers in the form of thousands of costumes, shoes, hair, makeup, advertising, and the like.  (See, e.g., ███████████

███████████████████████████████

███████████████(Parker Dep. Vol. II, Ex.1; Jordan Dep. 92-93 (dancer has 1,000 costumes, each costing at least $50.00).  On average, named Plaintiff Wilson spends on average ***$15,320.00 a year*** on her

exotic dancing business.  (See, e.g., Wilson Dep. 57-62, 101.[13])  ████

████████████████████████████████

████████████████████

Club Onyx's direct investment in Plaintiffs' exotic dancing, on the other hand, is limited to the stage and poles.  Each Plaintiff, and certainly Plaintiffs collectively, invest significantly more than Club Onyx in their exotic dancing.  This factor weighs against finding that Plaintiffs are employees, and in favor of independent contractor status.

### 4.   Plaintiffs are skilled dancers who use their skills in an independent way.

Whether or not Plaintiffs were required to be skilled dancers to perform at Club Onyx is not a legal question foreclosed by fact-based determinations in other cases.  Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 92d Cir. 1988) ("[t]he existence and degree of each [economic realities] factor is a question of fact"); Wargo, 803 F.2d 632, 634 n. 1 (11th

---

[13]  Ms. Wilson testified that she spends $50.00/week on makeup, (Wilson Dep. 57:12-13); $750.00/month for hairstyling during her first year, (id. at 58:8-15), and between $200.00 and $400.00/month during her second year, (id. at 59:6-10); $30.00/month for haircurling at the club, (id. at 24;19-23); $100.00/month on manicures and pedicures, (id. at 59:25); $200.00/month for costumes during her first year, (id. at 60:20-25), and approximately $50.00/month during her second year, (id. at 61:18-19); $500.00 for three initial pairs of shoes, and $50.00 every few months for new shoes, (id. at 62:1-9); $75.00/month in jewelry, (62:20-23), and $200.00/month for a personal trainer. (Id. at 101:12-18).

Cir.1986)(subsidiary findings are questions of fact). Unlike Club Onyx, which inquires into dancers' previous experience, requests dancers have prior dance experience, and actually assesses their dancing skill and performance quality, (Leaphart Dep. 48; Hayes Dep. 10; Adams Dep. 15-16, Williams Dep. 34, 36, contra PSMF ¶186), none of the clubs in the cases cited by Plaintiffs so inquired or assessed. See supra Reich v. Priba, 890 F. Supp. at 592 (N.D. Tex. 1995)(concluding that dancers *in that case* were not required to have specialized skill to perform because "several of the witnesses who testified at trial stated they had no prior experience as topless entertainers before their employment at Cabaret Royale"); Circle C., 998 F.2d at 328 (same, finding that "[m]any of the dancers did not have any prior experience with topless dancing before coming to work for Circle C."); Harrell, 992 F.Supp. at 1351 (same), Jeffcoat, 732 P.2d 1073 (same, finding that "[t]he [Jeffcoat club], however, hired dancers without knowing whether or not they had danced previously"); and Morse, 2010 WL 2346334, at *5 (same, upon finding that the Club "claims that the entertainers are not trained dancers" and "nothing in the record indicates that [the club's] hiring process included an assessment of a prospective dancer's communication or counseling skills").

The evidence in this case affirmatively shows that Club Onyx dancers, including Plaintiffs, are skilled, and come to perform at Club Onyx with prior experience performing exotic dancing at other clubs. (Independent Contractor Agreement, at ¶I; Williams Dep. 37; Clincy Dep. 20-21, 30; Parker Dep. 22, 27-30, 44-45; Sales Dep. 20, 99; Jordan Dep. 24-25, 46; Leaphart Dep. 17-19, 24, 40-47, 160; Pough Dep. 38; Adams Decl., Par. 13; Dancer Affidavits, at ¶3, <u>contra</u> PSMF at ¶186). Maybe not in <u>Jeffcoat</u>, but in this case, "the skill required for [exotic] dancing was [*not*] slight." <u>Contra</u> MPSJ at 20, <u>quoting</u> <u>Jeffcoat</u>, 732 P.2d 1073 (emphasis and insertion of "not" added). Plaintiffs' reliance upon <u>Brock v. Superior Care, Inc.</u>, 840 F.2d 1054, 1060 (2d Cir. 1988), does not make the dancers any less skilled. True, "the fact that workers are skilled is not itself indicative of independent contractor status." <u>Id.</u> <u>Brock</u>, however, did not turn on use of skills in an "independent way," as Plaintiffs would have the Court believe. Rather, the <u>Brock</u> court found that the nurses in that case "depended *entirely* on referrals" from a temporary health-care referral agency to find job assignments, and that the agency "in turn controlled the terms and conditions" of the relationship. <u>Id.</u> It was also significant that the referral agency actually employed other nurses, which were taxed, and that these

nurses performed exactly the same work as the putative independent contractor nurses. See id. at 1059.

Here, Club Onyx does not control the terms of the business relationship. See generally supra Part B.1. Plaintiffs are not entirely dependent upon Club Onyx to remain in this line of business; each Plaintiff has the ability to perform at other nightclubs in addition to Club Onyx, and many of them actually do. (Williams Dep. 9; Hayes Dep. 86; Adams Dep. 13; Leaphart Dep. 27-28, 32, 181; Wells Dep. 16-17, 80; Jordan Dep. 39, 41; Parker Dep. 37-38; Cliff Adams Decl., ¶5). Some dancers also have careers or businesses wholly independent of their exotic dancing careers. (E.g., Leaphart Dep. 15, 145). Plaintiffs are skilled performers, and this factor weighs in favor of independent contractor status.

### 5. Plaintiffs' relationships with Club Onyx are transient at best, which indicate non-employee status.

Plaintiffs have previously admitted to the Court that dancers who perform at Club Onyx are "transient" and do not have a permanent relationship with the Club. (See, e.g., Doc. 12-1 at n. 11; Doc. 47 at 10). None of the dancers has an exclusive business relationship with the Club. (Wilson Dep. 16-19, 80; Leaphart Dep. 15, 27-28, 32-33, 35-36; Parker Dep. 31-32, 37-42). Together, these factors weigh greatly in favor of independent contractor status. Doe v. Cin-Lan, Inc., 08-CV-12719, 2008 WL 4960170

(E.D. Mich. Nov. 20, 2008)("the Court is reluctant to conclude that someone can become an FLSA 'employee' by merely staying on a job longer than is usual for workers of a given type").

Plaintiffs' footnote 17 seeking to diminish this factor does not make it so. Again, Plaintiffs seek to make a binding legal standard out of a fact-based determination. Brock, 840 F.2d at 1059 ("[t]he existence and degree of each factor is a question of fact"); Wargo, 803 F.2d 632, 634 n. 1 (11th Cir.1986) (subsidiary findings are questions of fact). Circle C. is not analogous to this case. The evidence showed that the dancer in Circle C. had no skills, only invested in her costumes, and the club exercised significant control over her and her opportunity for profit. 998 F.2d at 328-29. *Because of those facts*, the transient nature of her work was not enough to find her an independent contractor. Id.

The facts in this case differ substantially. See supra Part B. Id., contra Harrell, 992 F. Supp. at 1352 (placing less emphasis on the permanency factor in large part because the "[d]efendant did not raise, much less argue, this factor."). Further, Plaintiffs are not seasonal, unskilled workers performing everyday chores Reich v. Priba Corp. or Martin v. Priba would have them be by reference to McLaughlin v. Seafood, Inc.. 890 F. Supp. at 593 & 1992 WL 486911, at *5, both citing 861 F.2d 450, 452-53

(5th Cir. 1988); see also Brock v. Mr. W. Fireworks, Inc., 814 F.2d 1042, 1045 (5th Cir.), cert. denied, 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987)(reconstruing the permanency factor only for cases involving seasonal work, holding "that when an industry is *seasonal*, the proper test for determining permanency [is] whether the alleged employees worked for the entire operative period of a particular season").   Nor do the economic realities factor uniformly favor employee status as they did in Seafood, Inc. Compare Part B, with 861 F.2d 450.

### 6. Club Onyx's essential function is to be a "place to see and be seen" in Atlanta.

Club Onyx is one of the premier nightclubs in the Southeast, which regularly features appearances by international superstar rap and R&B artists, and celebrity sports and entertainment personalities, and is known as "a place to see and be seen."  (Williams Dep. 67-70; Hayes Dep. 19-20, 31-32, 35, 38-39; Adams Dep. 37-38, 45-47, 49-52, 57; Leaphart Dep. 22-23, 72-73; Parker Dep. 151; Sales Dep. 88-89).   To this end, Club Onyx regularly promotes these appearances, which result in significantly higher customers than on non-promoted nights.  (Wells Dep. 97; Sales Dep. 89; Jordan Dep. 110-112; Parker Dep. 152).   Club Onyx is also known for selling liquor by the glass *and bottle*, a unique privilege in the Atlanta bar and nightclub community, which further contributes to the Club's caché.

(Adams Dep. 47-48, 52). The Club also offers adult entertainment in the form of nude, female exotic dancing as well as full-service bars, numerous large-screen televisions broadcasting sporting events, pool tables, VIP rooms and a kitchen offering customers a variety of menu items. (Adams Dep. 57, Williams Dep. 101-103; Leaphart Dep. 98-99). The few rules and policies Club Onyx enforces as it relates to its dancers are targeted toward protecting its privilege to sell liquor, which contributes greatly to the Club's desired cache as "the place to see and be seen" in Atlanta. See supra Part B.1.

Nude dancing, while also contributing to the Club's caché, is not its essential function. The Club's clientele proves it. Not all of Club Onyx's customers ask dancers to perform table-side dances or tip them while performing on stage; instead, many customers come to Club Onyx simply to drink, dance, listen to music, watch sporting events, shoot pool, and have a good time in a hip, urban nightclub setting. (Hayes Dep. 69; Leaphart Dep. 97). On promoted nights, customer traffic increases significantly and the percentages of female to male clientele shift from 70-80% male on non-promoted nights to 60% male/40% female on promoted nights. (Jordan Dep. 110-112; Pough Dep. 108; Parker Dep. 152). In fact, for some promotions, there have been more women than men in the Club. (Parker Dep. 152; Sales Dep. 89).

If, however, the Court should find that exotic dancing is integral to the Club's business, this aspect alone cannot be allowed to tip the balance in favor of employment status because the remaining factors taken together favor independent contractor status. Dole v. Amerilink Corp., 729 F. Supp. 73, 77 (E.D. Mo. 1990), citing Halferty v. Pulse Drug Co., Inc., 821 F.2d 261, 265 (5th Cir.1987).

### 7.   Plaintiffs consistently hold themselves out as independent contractors, including to the IRS – to their material benefit.

Finally, although Plaintiffs argue otherwise, their actions in behaving and representing themselves to Club Onyx, the IRS,[14] and others as independent business persons who contract with Club Onyx is an economic reality.   Usery, 527 F.2d 1308 ("The controlling economic realities are reflected by the way one actually acts.").

Unlike in any of the cases Plaintiffs cite, Plaintiffs here affirmatively elected to be treated by Club Onyx as independent contractors.   Club Onyx presented each dancer with an Independent Contractor Agreement and a "Wage Acknowledgment Regarding 'Tip Credit'" document, which states:

> The club and entertainer agree that the relationship between them is of an independent contractor/space use nature.   Both club and entertainer

---

[14] Several of the named Plaintiffs have not filed federal income tax returns for the years they performed at Club Onyx.  Those that have, for the most part asserted their Fifth Amendment privilege against self-incrimination when questioned about the content of their returns.

acknowledge that *if the relationship was that of employer and employee, the Club would be entitled to collect and retain all Entertainment Fees paid by customers to Entertainer*.

(Wage Acknowledgment Regarding Tip Credit, attached hereto as Exhibit "2" and expressly incorporated by reference)(emphasis added).   The document further details how each dancer would be paid under a formal employer-employee relationship, that taxes would be subject to withholding requirements, and that the dancer could keep tips, but not fees. (Id.) The document further explains that if the dancer was an employee, the dancer's employment would be "at will" and the Club would be entitled to control the manner and means of her performances. (Id.)   Immediately above the signature line, the acknowledgment states in underlined, uppercase letters:

ENTERTAINER FURTHER SPECIFICALLY REPRESENTS THAT SHE DOES NOT DESIRE TO PERFORM AS AN EMPLOYEE OF THE CLUB SUBJECT TO THE EMPLOYMENT TERMS AND CONST[I]TUTIONS (sic) OUTLINED ABOVE.  BUT RATHER, DESIRES TO PERFORM UNDER A SPACE USAGE AGREEMENT AS AN INDEPENDENT CONTRACTOR.

(Id.)(emphasis in original).   "All [decisions relating to this election] are exclusively reserved to the control of the entertainer." (Id.)

No Plaintiff, when given this choice, elected or opted to be treated as an employee. Instead, each voluntarily chose to perform for Club Onyx as an independent contractor, and each has benefited greatly from her decision, frequently leaving the Club at the end of their shifts with a trash bag full of

money, most of which come from fees, which under an employer-employee agreement, would belong to the Club. (Clincy Dep. 73-74, 76-77, 79-80; Leaphart Dep. 22-23, 46-47, 72-73, 96-97, 100-102, 143-145; Parker Dep. 46-47, 133-134; Pough Dep. 42, 84, 90). Plaintiffs' routine recoupment of large sums of money is based entirely upon their choice to be treated as an independent contractor. This is an economic reality the Court cannot ignore.

Second, several Plaintiffs reaffirmed that they understood their independent contractor status ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ (E.g., supra, Leaphart Dep. Vol. II, Exh. 1 ████████████; see also Covington Dep. Exs. 1 (NKA0005151-5153), 4 and Covington Dep. 28 ████████████████████████████████ ██████████████████████████ ████████████████████████████████████ ████████████████ See Harrell, 992 F. Supp. at 1353 ("[C]haracterization for ████████████...[is] not relevant" to FLSA.) Reliance upon Harrell for this proposition is error because it incorrectly limits economic realities analysis to the six factors. See id. ("Defendant cites no case which considers ████ factors in the context of the broad "suffer or permit to work" definition of

employment contained in the FLSA."), but see supra Hodgson, 471 F.2d at 237-38 ("economic reality does not depend on technical or isolated factors...but the circumstances of the whole activity")(internal quotations and citations omitted).  Harrell also errs in characterizing ███████ as irrelevant under the FLSA.  Id.  Further, cases which diminish a party's ██ ███████ for FLSA status purposes uniformly did so when the party was not able to negotiate his ██ status with his putative employer.  E.g., Molina v. S. Florida Exp. Bankserv, Inc., 420 F. Supp. 2d 1276, 1288 (M.D. Fla. 2006); Baker v. Barnard Const. Co. Inc., 860 F. Supp. 766, 772 (D.N.M. 1994) aff'd sub nom. Baker v. Flint Eng'g & Const. Co., 137 F.3d 1436 (10th Cir. 1998). As shown above, this is not the case here; each Plaintiff clearly negotiated her own status, made a choice to work as an independent contractor, to benefit directly from that arrangement, ██████████████ ███████ The circumstances ██████████████, ██ weighs in favor of independent contractor status.

At least one named Plaintiff has represented herself in numerous forums as a business person, █████████████, and has sought a business license and tax identification number for her exotic dancing business.  (Parker Dep. 53-54).  Another Plaintiff, Karenza Clincy, █████████████

████████████████ (<u>See supra</u> Clincy Dep. Vol. II, Exh. 1). ██

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████ <u>See, e.g.</u>, <u>Santelices v. Cable Wiring</u>, 147 F. Supp. 2d 1313, 1321 7& 1323 (S.D. Fla. 2001), <u>citing</u> <u>Aimable</u> 20 F.3d at 440 (ability to make direct employment decisions such as whom and how many employees to hire is a specific indicent of the control factor; "independent contractors are at liberty to hire [her] own helpers.")

Finally, the City of Atlanta recognizes each Plaintiff-dancer as an independent business entity and imposes upon her the responsibility of acquiring an individual adult entertainment license for *each* establishment at which she wishes to dance.   C.O.C.A. § 10-206(a) ("No person shall perform…at an adult entertainment establishment…which is licensed [to sell alcohol]…until such person…***has been issued a permit…indicating such person is eligible to perform…at the particular establishment at issue***.")(emphasis added); <u>accord</u> (Hayes Dep. 15-16; Adams Dep. 31-32; Leaphart Dep. 50-52; Parker Dep. 48; Cliff Adams Decl., ¶7).  Each Plaintiff independently obtained and paid for her license to dance at Club Onyx – with no assistance from the Club – as they did for similar licenses to dance

at other venues in the City at which they have performed.  (Clincy Dep. 111; Pough Dep. 24-25, 27-28, 38, 44-45; Parker Dep. 29, 50; Sales Dep. 20; Leaphart Dep. 50-52; Wells Dep. 16-17; Jordan Dep. 27, 41; Cliff Adams Decl., ¶7).

**C.    Plaintiffs have not borne their burden under either the FLSA or RULE 56; their motion for partial summary judgment should be denied.**

Plaintiffs bear the burden both under the FLSA to establish their employee status, and to make a proper showing for summary judgment. They have done neither.

The undisputed facts surrounding Plaintiffs' expectation for compensation require summary judgment in Defendants' favor.  Alternately, the disputed material facts surrounding the "economic realities" preclude the Court from granting partial summary judgment to Plaintiffs based on the "economic realities" test.  Here, Defendants have disputed the overwhelming majority of Plaintiffs' *226* alleged separate material facts by directly comparing sworn statements and affidavits, and other primary source documents, mostly from Plaintiffs themselves, to the statements they proffered.  (See also supra n. 11).  Defendants have not made "speculation or conjecture," or put forth a "mere scintilla of evidence," but rather have cited to the record to show specific facts which, should the Court find analysis

under economic realities test appropriate, create a genuine issue for trial on this issue. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir.2005). Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990); Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir.2004).

There being genuine issues for "economic realities" analysis purposes, Plaintiffs' Motion for Partial Summary Judgment should be denied.

## CONCLUSION

For the foregoing reasons, as well as those stated in Defendant's Motion for Summary Judgment, Plaintiffs' Motion for Partial Summary Judgment should be denied.

This 4th day of November, 2010.

Respectfully submitted,

/s/ Susan Kastan Murphey
SUSAN KASTAN MURPHEY
Georgia Bar No. 408498

/s/ Dean R. Fuchs
DEAN R. FUCHS
Georgia Bar No. 279170

/s/ Matthew P. Shaw
MATTHEW P. SHAW
Georgia Bar No. 101257
Counsel for Defendants

SCHULTEN WARD & TURNER, LLP
260 Peachtree Street, NW, Suite 2700
Atlanta, Georgia 30303
(404) 688-6800
(404) 688 6840 facsimile

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **KARENZA CLINCY, et al.**      ) | |
| ) | |
| **Plaintiffs,**      ) | |
| ) | **CIVIL ACTION FILE** |
| **v.**      ) | **NO. 1:09-CV-2082-RWS** |
| ) | |
| **GALARDI SOUTH ENTERPRISES,**      ) | |
| **INC., d/b/a THE ONYX, et al.**      ) | |
| ) | |
| **Defendants.**      ) | |
|      ) | |

## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that this filing complies with the font size requirements of Local Rule 7.1D and that I have this date served the within and foregoing **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** on the following by using the Court's CM/ECF electronic filing system to insure delivery:

Donald H. Nichols:       nichols@nka.com

E. Michelle Drake:       drake@nka.com

Steven A. Smith:       smith@nka.com

Anna P. Prakash:       aprakash@nka.com

Jennifer K. Mason:       jkisermason@yahoo.com

This 4th day of November, 2010.

/s/ Dean R. Fuchs

DEAN R. FUCHS

Georgia Bar No. 279170

SCHULTEN WARD & TURNER, LLP
260 Peachtree Street, NW, Suite 2700
Atlanta, Georgia 30303
(404) 688-6800
(404) 688 6840 facsimile